JULIANA SANABRIA, Plaintiff and Appellant, *v.* HEIRS OF MANUEL GONZÁLEZ MARTÍNEZ ETC., Defendants and Appellees.

No. 10726. Submitted June 22, 1953.—Decided June 8, 1961.

*Samuel R. Quiñones, Guillermo S. Pierluissi, Santiago Polanco Abreu* and *Ernesto Juan Fonfrías* for appellant. *R. Rivera Zayas, G. Rivera Cestero, Milton F. Rúa* and *Iván Reichard* for appellees. *James R. Beverley* and *José López Baralt* for appellees Ana María Hernández widow of González and Jorge González Hernández.

MR. JUSTICE BELAVAL delivered the opinion of the Court.

This is an action of filiation filed by a natural daughter against the legitimate heirs of her father. The three main allegations are as follows: That "about the years 1903, 1904, and 1905, Manuel González Martínez and Monserrate Sanabria, also known as Isilé Sanabria, lived in concubinage in the town of Salinas, and as a result of these relations plaintiff herein was born on February 1, 1905"; that "at

the time of plaintiff's conception and for some time prior to and after said date, Manuel González Martínez and Monserrate Sanabria were not married and there was no impediment at all for them to marry, with or without dispensation, and during all that time Monserrate Sanabria was known to be living in concubinage with Manuel González Martínez"; that "during the entire period of time between plaintiff's conception and birth and the date of the death of Manuel González Martínez, he held plaintiff as his daughter, took care of her support and education, referred to her as his daughter in conversations, always maintained with her relations of father and daughter, regarded her publicly and privately as his own daughter, and during all that time plaintiff was always in the uninterrupted possession of the status of a natural daughter of Manuel González Martínez, which was expressed and justified by acts performed by Manuel González Martínez as well as by acts performed by his relatives."

The petitioner in this case was born on March 8, 1905, when the grounds for requesting filiation were governed by § 189 of the Revised Civil Code of Puerto Rico of 1902, whereupon the father was bound to acknowledge his child: "1. Where there be an authentic statement in writing made by him expressly recognizing its paternity; 2. When publicly or privately he has shown that it is his child, or has called it as such in conversation, or looks after its education and maintenance; 3. When the mother was known to have lived in concubinage with the father during the pregnancy or birth of the child, or when the child was born while his parents were engaged to be married (relaciones amorosas)."

As may be noted, at the time petitioner was born there existed in our legislation as grounds for requesting filiation, the following: (1) the authentic statement in writing; (2) when publicly or privately the father has shown that it is his child; (3) when he has called it as such in con-

versation; (4) when the father looked after its education and maintenance; (5) when the mother was known to have lived in concubinage with the father during the time of pregnancy; (6) when the mother was known to have been living in concubinage with the father at the time the child was born; (7) when the child was born while his parents were engaged to be married (*relaciones amorosas*).

There is no doubt that the second ground for requesting such action: "when publicly or privately he has shown that it is his child" constitutes a more elastic rule than the famous "uninterrupted possession of the status of natural child of the father" of our latter legislation. Likewise, the seventh ground: "When the child was born while the parents were engaged to be married" is not as strict as the rule established by our subsequent legislation which provides for the acknowledgment if "the mother was known to be living in concubinage with the father during the pregnancy or birth of the child".

From 1902 until 1911, the rules governing the cases for requesting an illegitimate filiation—which included the natural filiation—were much more comprehensive, for during that period our law was set free from the former Spanish dogmatic which generally prohibited the inquiry into the paternity. This being so, it is not difficult to conclude that the interpretation of the evidence should be different: *Alicea* v. *Antuñano*, 50 P.R.R. 880, 889 (Travieso) (1937).

On the other hand, at the time of deciding this case the trial court did not have the benefit of our subsequent decisions as to the nature and quantum or quality of the evidence necessary to establish the paternity: *Figueroa* v. *Díaz*, 75 P.R.R. 152 (1953), (Negrón Fernández), (Marrero), (Ortiz), (Sifre), at 163–164, 173, 179, 181, 184. In *Figueroa* v. *Díaz, supra,* we held that filiation should be decided according to the preponderance of the evidence, as any other

civil suit, disregarding the former doctrine which required the filing of a "strong and convincing evidence."

It is unquestionable that in this case the trial court, at the time of weighing the evidence, applied the former view of "strong and convincing evidence" and by virtue of said application it disregarded the testimonies which implied clear acts of acknowledgment. Besides, there are certain expressions of the trial court that lead us to conclude that following the language of *Torres* v. *Heirs of Caballero*, 39 P.R.R. 654, 659, (Aldrey), (1929), it examined the evidence with "suspicion" because this action was filed after the death of the natural father.

The language used by Mr. Justice Aldrey in the *Torres* case could not be fully understood without bearing in mind that the illegitimate child was born on December 3, 1895, when the declaration of his status was governed by subdivision 2 of § 135 of the Spanish Civil Code. It is difficult for us today to transfer said spirit to an interpretation of our present filiation system.

In any way, if within the scientific nomenclature of a jurisprudence the principle established in *Torres* v. *Heirs of Caballero, supra,* as to the point here under consideration, may be considered as still in force, the same should be overruled.

Furthermore, as a question of law, if the right to request the filiation is extended to a period of time subsequent to the death, it is our duty as triers to give force and effect to the legislative rule, for without indulging in speculations it is possible to think of a set of moral, social, economic, and even merely sentimental circumstances by virtue of which a natural child does not wish to institute an action of filiation during the lifetime of his father.

The petitioner complains that the trial court did not attempt to reconcile the evidence of both parties, pursuant

to the rule established by us in *Meléndez* v. *Cividanes*, 63 P.R.R. 4, 10 (De Jesús), (1944). There is a certain perceptible tendency in the findings of fact and conclusions of law of the trial judge which seem to indicate that he undertook to establish a sharp separation as to the credibility of the testimony, giving excessive credit to the witnesses for the defendants and hardly any or none to the witnesses for the natural daughter.

Examining carefully the degree of interest or disinterest of each witness for the defendant heirs in the present case —family nexus, social relations, friendship relations, master and servant relations, benefits received in the past or in the present, such as dowries, gifts, pensions, royalties, trips or mere interest of litigant—we realize that it is impossible to establish the sharp division in the credibility made by the trial court  Likewise, it is not difficult to conclude that the cautious position in which the judge placed himself, undoubtedly influenced by the principle laid down in the *Torres* case, did not permit him, upon weighing the evidence, to reach the truth of the facts.   In this sense it is advisable to remember the wise words of Mr. Justice De Jesús in *Meléndez* v. *Cividanes, supra*, at 10:

"However, experience shows that in few cases submitted mainly on oral evidence each party adheres strictly to the truth. Ordinarily none of the parties tells the whole truth.   Most frequently a witness conceals or alters specific facts and either mindfully or sometimes unmindfully, he exaggerates them or tries to add a special coloring which always tends to favor the party for whom he is testifying.  But that is human nature.  For that reason, when the judge is weighing the evidence—a difficult step in judicial process—he is called upon to apply his knowledge of human nature, and with a sound and fair discretion, he must distinguish truth from falsehood; and detach the probable and reasonable, from the improbable and doubtful, without overlooking the surrounding circumstances.   Once the truth is determined by accepting what may be true of each party's theory it will be an easy task to weigh the evidence."

We feel sure that the mental element which prevailed in the conscience of the trial judge was not partiality, but induced by our former theory of the evidence in a filiation case, he examined it with too much caution, searching for the classic quality of "strong and convincing evidence." This has compelled us to examine anew all the evidence in order to see what will be the outcome if the general theory of the evidence in a civil case were applied: The preponderance of the evidence.

The method we shall use is quite simple: Examining the whole testimony we shall only take that part which is ratified or rectified on cross-examination or that part which is corroborated by the adverse evidence. We shall establish as an undisputed fact not only whatever is established by documentary evidence certified by a public officer of Puerto Rico, but that part of the oral testimony that is corroborated by the evidence of the other party or that part of the evidence that has not been contradicted. As to the facts in dispute we shall try to organize them in the order of relational common categories: chronologically, memorable evidence, descriptive or purely connective.

The evidence in this case is abundant. It may be said that it is one of the cases having the most extensive evidence ever to reach this Court. To summarize it in full would be outside the reasonable margin of exposition expected from a decision of this Court. For that reason we shall confine ourselves to present those main facts which should be considered in the final decision of the case.

We shall begin by stressing certain uncontroverted facts which appear spontaneously from the evidence: Sometime before 1881, Manuel González, while unmarried, sustained concubinage or love relations with Juana Sanabria, from which a natural daughter was born in 1881, named Isabel González, who was taken to the house by her father, don Manuel, before the child was seven years old.

The mother of Isabel González, Juana Sanabria, subsequently had concubinage or love relations with another man whose name is not revealed by the evidence, and of these relations there were born sometime before 1887, a son named Paco Sanabria, and in 1887 a second daughter, named Isilé Sanabria, who were taken by don Manuel to his own home, at the request of his daughter Isabel, sometime after August 8, 1899, date of the San Ciriaco hurricane.

Isabel González lived in the house of her natural father, Manuel González, until the month of June or July, 1903, according to the evidence of the defendant or until the month of August or September, 1904, according to the evidence of the plaintiff. Paco Sanabria, Isabel González' brother, lived in the house of don Manuel until one or two years before Manuel González left for Spain in June or July, 1903, according to the evidence of the defendant heirs. Isilé's sister, Isabel Sanabria, lived in the house of don Manuel until the month of June or July, 1903, according to the evidence of the defendant heirs or until August or September, 1904, according to the evidence of the plaintiff.

Isabel González, witness for the defendant heirs, testified that when her brother and sister arrived after the San Ciriaco hurricane, she and her sister Isilé slept in the upper floor of the house of don Manuel, and her brother Paco slept in the first floor (Tr. 1111). Plaintiff's witness, Francisco Romero, testified, on the other hand, that when the San Ciriaco hurricane destroyed the house in which Isilé Sanabria lived, don Manuel moved Isilé to a room (bedroom) situated in the lower floor of the house of don Manuel (Tr. 32). Possibly, there was a period of time in which the two sisters slept in the lower floor, for according to the testimony of Isabel González, the San Ciriaco hurricane swept off the roof of don Manuel's house (Tr. 1098–1099) and during all the time covered by these facts the house only had two stories. There is no evidence as to how long

the repairs of don Manuel's house lasted after the San Ciriaco hurricane.

Plaintiff's evidence tends to establish two concubinage periods between don Manuel González and Isilé Sanabria: the first one during the years 1901 and 1902, and the second, during the year 1904. Witness Romero says that he was in the house of Manuel González for the first time, since 1889 until 1901, and for the second time, from 1904 to 1908. During the years 1902 and 1903, witness Romero says that he went to live with his father in Sabana Hoyos and that in 1908 don Manuel sent him to work to the Fortuna estate, where he remained until 1912 (Tr. 36 and 53) when he left and never returned.

The first description of the love affair between don Manuel and Isilé, between the years 1900 and 1901, offered by witness Romero, is the following: Don Manuel entered the room of Isilé, lay in bed to play with her and then closed the door and "made love to each other, which love they both showed" (Tr. 32–34); that sometimes don Manuel entered the room at one o'clock in the afternoon and sometimes at night (Tr. 34); that sometimes he remained in the room two hours, other times more (Tr. 35); that when this happened there was no one else in the room (Tr. 35–36); that he saw that "many times" (Tr. 36).

Witness Romero testified that when he returned in 1904 to live in the house of don Manuel, he was told that Isilé had given birth to a child: "that was a rumor but I did not see it for sure (and) what one does not see one should not repeat" (Tr. 63). It is an uncontroverted fact that the first child of Isilé, named Luis, was born about September 14, 1903 and died December 14, 1903 (Exhibit 4).

The second description of the love affair between don Manuel and Isilé in the year 1904, offered by witness Romero, is as follows: "What I saw was that (don Manuel) entered the room (of Isilé), stayed there for a while and then left

and went out to make a round of his farm and returned and he did this every once in a while" (Tr. 38); and at the end of 1904, the witness saw when don Manuel sent Isilé to the house of Severo Sanabria, an uncle of hers, who lived in the Coquí ward, and "four or five months later she gave birth to a girl" (Tr. 38). It is an uncontroverted fact that the second child of Isilé, plaintiff herein, Juliana Sanabria, was born on March 8, 1905.

The descriptive term "at the end of 1904" should be understood as referring to a period of time between September and December 1904. In Puerto Rico we frequently use the terms at "the beginning of the year", in "the middle of the year", and at "the end of the year". A possible division of time in such arbitrary description, is to consider the year as divided into three periods of four months each.

To contradict this testimony of the love affair between don Manuel and Isilé Sanabria, the evidence presented by the defendants tends to prove three sets of facts which could be specified thus: (1) that Francisco Romero was not one of the servants of don Manuel during 1900 and 1904; (2) that on the probable date of plaintiff's conception—May or June, 1904—don Manuel was unable to have carnal intercourse with Juliana's mother, Isilé Sanabria, not only because he did not live in Salinas, but because he was ill or recovering in Coamo Springs; (3) that the first child of Isilé Sanabria, the deceased Luis, was the child of Higinio Pérez and not of Manuel González, and consequently, the second child of Isilé, plaintiff herein, was also the daughter of Higinio Pérez.

1. The testimony directly referring to the fact that Francisco Romero did not live in the house of don Manuel in 1904, comes from Dolores Briganti and Flor Ortiz. Witness Briganti places him in Húcar, without specifying the year, but working for don Manuel. On the contrary, witness Ortiz places Francisco Romero between Salinas and

Barritos: "they left (the family of Romero) in 1902 (from Barritos to Salinas) after elections (November 1902). In that same year (elections year) they left, and on the third, fourth, or fifth they returned to Barritos to the same farm". Witness Ortiz states that he is well-acquainted with the life of the Romero family because he lived maritally in Salinas for three years, with an aunt of Francisco Romero, named Visitación González (Tr. 2435). We note, however, that from the testimony of witness Ortiz, it appears that the latter lived with Visitación González in Salinas from 1910 on (Tr. 2440) when Francisco Romero already lived in estate Fortuna (Tr. 53). It seems that the trial judge entertained no doubt as to the stay of Francisco Romero in the house of don Manuel during the years covered by his testimony. Rather, he did not give it any credit because he considered it impossible, exaggerated, and contradictory, as we shall see in the final analysis of the evidence.

2. The testimony which refers directly to the impossibility of don Manuel to have sexual intercourse with Isilé Sanabria at the probable date of plaintiff's conception—May or June, 1904—are the testimonies of Isabel González, Ana María Hernández, Julio Benvenutti, and César Amy. As we have stated before, there are two versions of said impossibility: one, the repairs of the house of don Manuel, on account of his wedding, which rendered it impossible for him to live in Salinas, and the other, the illness of don Manuel.

Isabel González testifies that she and her sister Isilé had to leave the house of don Manuel in June 1903, because as soon as don Manuel left for Spain in 1903, the floor of the house of her father was demolished in order to prepare it for the wedding of don Manuel (Tr. 996). It is an uncontroverted fact that don Manuel and Ana María Hernández were married one year and two months after the possible trip of don Manuel to Spain, the wedding taking place on

September 3, 1904. The repairs made to the house, according to Isabel González, were the following: "more bedrooms and two dining rooms were added, because there was a small dining room" (Tr. 1175–1176); "two dining rooms were added, they constructed two dining rooms for the family and for any guests, and they installed toilets" (Tr. 1176). According to the testimony of Isabel, when don Manuel returned from Spain at the end of November 1903, don Manuel went to live at a house in Salinas, and Isabel visited him there twice (Tr. 1182). At that time—end of November 1903—the repairs of the house were almost finished, except for a few things (Tr. 1178); the bedrooms were almost ready to be used and the baths and toilets were ready (Tr. 1179–1180); only the ceiling and the painting had to be finished (Tr. 1180). She says that as soon as he returned from Spain, don Manuel became sick (Tr. 1142); and he got up in April 1904 (Tr. 1003) and went to Coamo Springs. She says that after don Manuel left Guayama to go to Coamo Springs, he went to visit Isabel at her house in Guayama (Tr. 1148 and 1160). She says that at the end of 1903 she was in Guayama (Tr. 998).

According to the testimony of Ana María Hernández, don Manuel became engaged to her on June 29, 1903 (Tr. 2436) and immediately left for Spain "because he said that he wanted to bring everything they were going to use from Spain" (Tr. 3437); and he returned from Spain on September or October, 1903, and from that date on he went to see her every week at Coamo Springs, until December 1903, when he ceased going because he was sick in Guayama at the house of his brother José (Tr. 3437). She says that in February or March, 1904, don Manuel went to see her at Coamo Springs, on his way to San Juan, where he went to be treated by doctor Ordóñez, and on his way back from San Juan he stayed at Coamo Springs (Tr. 3439). She says that he had to stay at Coamo Springs because he had

no house in Salinas as it was being repaired in order that the witness could live with him there after her wedding with don Manuel (Tr. 3440). She said that at times don Manuel went out to look after his business (Tr. 3440); but she immediately adds that don Manuel could not go out because he was sick (Tr. 3440) and that the sojourn at Coamo Springs lasted until July 26, 1904 (Tr. 3441). She says that at that time don Manuel told her: "I must go and see that the house is repaired, because otherwise we shall not be able to marry". (Tr. 3441.)

Julio Benvenutti testified that don Manuel made a trip to Spain in the middle of July and returned at the end of 1903 (Tr. 2799). He says that when don Manuel arrived at his farm in Salinas, he suffered malaria fever and the doctor recommended him to leave his farm, and then don Manuel went to the house of his brother, José González, who resided in Guayama, staying there until the beginning of 1904; and in 1904, feeling much better, he went to recover at Coamo Springs, where he continued recovering until he married. He stayed in Coamo Springs from January 1904 until September 1904, when he married. (Tr. 2799.) He says that don Manuel told him that he accepted Isabel as his daughter because she was virtuous (Tr. 2807–2809). He says that Isabel González was living with don Manuel "until the spring of 1903, when I went to say good-bye to don Manuel because he was going to Spain, and I told him —where is Isabel going to stay? —and he told me —Well, Isabel is going to a farm I own" (Tr. 2810). He says that when don Manuel returned from Spain he went to live at his farm (Tr. 2838). Now he says that don Manuel was living in Guayama during the months of "January, February, and until March, more or less, when he went to Coamo Springs" (Tr. 2849).

César Amy testified that in the month of January 1904 he suffered a malaria attack (Tr. 2588) and went to Coamo

Springs in the month of May 1904 (Tr. 2589). He says that don Manuel was at Coamo Springs recovering (Tr. 2590). He says that don Manuel "went out in a carriage and they came for him and he went out on a trip, he does not know where the trip was to" (Tr. 2591), but don Manuel went out in a carriage "with a coachman that came from there, from the estate, to fetch him" and "he was from the same place where don Manuel lived" because he came in the carriage of don Manuel (Tr. 2613). He says that don Manuel was staying at Coamo Springs recovering and the witness does not know whether he was ill or not "but he heard that he was recovering" (Tr. 2613). He says that don Manuel "went out occasionally, he went out, for example, once a week, then he returned late for supper, but I cannot tell you whether he stayed the whole week or went out during that week" (Tr. 2615).

The orderly relation of the four testimonies above-stated depicts the following picture: Don Manuel leaves Puerto Rico to go to Spain, after becoming officially engaged to Ana María on June 29, 1903. When he returns from Spain he goes to his house at Salinas, which is almost completely repaired for the wedding, there only remaining part of the ceiling and the paint. In the month of December 1903, don Manuel suffers malaria fever and goes to the house of his brother José, in Guayama, where he remains for the months of January and February 1904. On this latter month he goes to San Juan to consult doctor Ordóñez, and on his way back he stays at Coamo Springs to recover. There is evidence that during this recovery don Manuel leaves Coamo Springs to visit his daughter Isabel in Guayama, goes to his farm at Salinas in a carriage which comes from his farm to pick him up and he goes about his business. This is the period connected with the second description made by plaintiff's witness, Francisco Romero, of the love affair between don Manuel and Isilé Sanabria: "What I saw was that (don

Manuel) entered the room (of Isilé) and stayed for a while and then left and went out to make a round of his farm and returned and he did this *every once in a while*" (Tr. 38). We must discard, therefore, that the repairs of the house of don Manuel or his recovery at Coamo Springs were absolute impediments for any love affair between don Manuel and Isilé Sanabria, between the months of May to June, 1904, on which dates the plaintiff must have been conceived.

3. The testimonies which refer directly to the fact that the first child of Isilé, named Luis Sanabria, was the son of Higinio Pérez and not of don Manuel González, and consequently, the second child of Isilé, plaintiff herein, was the daughter of Higinio Pérez and not of don Manuel González, are the testimonies of Isabel González and Dolores Briganti.

As previously stated, Isabel testified that she and her sister Isilé had to leave the house of don Manuel at Salinas in June 1903, because when the repairs were commenced for the wedding of don Manuel and Ana María, the floor of the house was demolished (Tr. 996). She says that then she and her sister Isilé went to Besosa—probably the house of Severo Sanabria, uncle of Isabel and Isilé, because the estate or property named Besosa is situated in the Coquí ward (Tr. 2269) where Severo lived (Tr. 37). Another indication revealed by the evidence as to the place where both sisters might have gone to live is the phrase quoted by don Manuel to Julio Benvenutti, while don Julio was visiting him in the spring of 1903, to say good-bye to don Manuel, at his farm in Salinas, and when asked where Isabel would stay, don Manuel answered: —"Well, Isabel is going to a farm I own". According to Isabel, they stayed in Besosa several months (Tr. 1125) —it must have been between July and August 1903, as we shall see hereafter—and from Besosa they went to the beach at Las Mareas, where they stayed for about fifteen days (Tr. 1125). After this,

according to Isabel, she stayed in Guayama (Tr. 993) and Isilé went to live to Los Riegos with Higinio Pérez (Tr. 998).

The only uncontroverted facts before us to organize this portion of the testimony of Isabel González, are the birth of Isilé's first son, Luis, who is born about the middle of September 1903 and the latter's death, when he was three months old, on December 14, 1903 (Exhibit 4). It seems that Isabel does not know of the love affair between Isilé and Higinio prior to that date. She says that when they both left his father's house she did not notice that Isilé was pregnant (Tr. 1140). However, at that time Isilé must have been at least six months' pregnant. It is unquestionable that when Isilé left Las Mareas, leaving her sister there, it is to give birth to her first son, either at the house of her uncle, Severo Sanabria, in the Coquí ward, as averred by defendant's witness, Dolores Briganti, or at a house allegedly belonging to Higinio Pérez in Los Riegos, as averred by Isabel. If Isabel's version were true, to the effect that her sister went to Los Riegos, the most probable thing would have been for Isilé to have her first child in the house of her brother, Paco, who lived in Los Riegos.

There are two points in the evidence which seem to confirm in part, Isabel's version: first, the fact that it is Paco Sanabria who testifies in the Civil Registry as to the death of Isilé's first son, and second, the categorical statement of the witness Briganti, that the only man who set up a house for Isilé was Gaspar Carrillo, and that was, according to the witness, in 1907 (Tr. 1474). There are some contradictory statements of the witness Briganti but which may be traced from the "landing" of don Manuel, which seem to support the testimony of Isabel to the effect that Isilé leaves Las Mareas to go to Los Riegos. The rest of the evidence of the defendants shows that the love affair between Gaspar Carrillo and Isilé must have been in 1911.

We make a halt in the relation of the testimony of Isabel to refer now to the testimony of Dolores Briganti, in order to maintain a certain chronological order in the exposition of the evidence.

For the sake of a strict methodological order we are compelled to set forth *in extenso* the testimony of witness Briganti. The testimony of witness Briganti, a septuagenarian (Tr. 1424), deaf (Tr. 1425), without any memory for anything except the history of this case (Tr. 1581–1582), even where her own children are concerned (Tr. 1504–1506), is a true test for the equanimity of a trial judge. When she testified in the Court of First Instance on June 23, 1948, she stated that she was close to seventy years of age (Tr. 1424). According to this statement she must have been born around 1879.

She says that she knew Manuel González in 1903 at the beginning of the year (Tr. 1425) when she came from Salinas to live in the house of don Manuel (Tr. 1425–1426). But immediately she adds that she first came to live at Los Riegos and then in 1903 she went to live at the farm of don Manuel (Tr. 1426). From defendant's own evidence we learn that Los Riegos is quite distant from Sabater, the farm where the house of don Manuel is situated (Tr. 1873). She says that she was born in the town of Salinas (Tr. 1479) and went out to the country (to Los Riegos?) at the age of 18 (Tr. 1480). According to this statement she arrived at the farm in 1897. She says she does not remember when she was born, but that when she went out to the country (1897?) she already had a husband and two children (Tr. 1480). She says that she first lived with her husband when she was 17 years old (Tr. 1481–1490). According to this statement, in 1896 the witness was still in Salinas. She says that on January 2 she already lived in the country (Tr. 1487) and that she spent the Three Kings holiday at Los Riegos (Tr. 1487). According to this statement she

probably refers to January 2, 1897. She states that she went to live "in front of a gate on the road leading from Cayey to Sabana Llana" (Tr. 1487).

She remembers that she had her first child at Los Riegos assisted by the midwife Petrona Villegas (Tr. 1489), but does not remember the date when her first child was born (Tr. 1489), although she remembers that her first child was born two years after she began to live with her lifetime companion (Tr. 1490). According to this last statement her first child must have been born in 1898. Now she says that she was 17 or 18 years of age when her first son was born (Tr. 1491). According to this statement it must have been born in 1896 or 1897. Now she says that on the day of the San Ciriaco hurricane—August 8, 1899—she was in Barritos, a point quite distant from Los Riegos (Tr. 1492–1493), although in Barritos she lived about three months (Tr. 1493) ; and that she left Barritos to go to Los Riegos (Tr. 1494). Now she says that she had all her children in the property of don Manuel (Tr. 1506), two of them when she was not working in the house of don Manuel (Sabater) (Tr. 1507), and the other two in Los Riegos (Tr. 1507). According to this last statement she had her first two children after 1899, between the years 1900 and 1901. Now she says that she first lived in Los Riegos and don Manuel, afterwards, moved them to Barritos, where they stayed three months and "then the hurricane took us there" (San Ciriaco) (Tr. 1522).

She states that they stayed in Los Riegos two years and after two years don Manuel changed them to Barritos, and three months later changed them to a farm across his house (Tr. 1523). She says she had two children in Los Riegos (Tr. 1523), possibly by 1897 and 1898—although she adds that in 1900 rather than in the house of don Manuel, the witness was still in Los Riegos (Tr. 1524). Finally she admits that she does not remember any date before 1903

and that after 1903 she only remembers some and that she does not remember the date when she went to live to the house of don Manuel (Tr. 1524). She says that after living in Barritos for three months she was immediately taken, not to the house of don Manuel, but to a house in front of don Manuel's house (Tr. 1524). As may be noted, this must have been immediately after the San Ciriaco hurricane —August 8, 1899. She now states that the same year she was taken to the house in front of don Manuel's, the latter sailed away (Tr. 1525). The witness refers to the trip which, according to the evidence of the defendant heirs, was made by don Manuel in June 1903. Finally, she explains that when they left Barritos—after August 8, 1899—they did not come to live in front of don Manuel's house "because we lived next to a slope when we came to live further down don Manuel's house" (Tr. 1527); at a fair distance from the house of don Manuel (Tr. 1528) and that it was when don Manuel married—September 3, 1904—that they came to live in front of don Manuel's house (Tr. 1528).

No matter the type of relational structures we use, the only manner of reconciling this testimony is: that Dolores Briganti and her lifetime companion arrived from Salinas at the farm of don Manuel two years before the San Ciriaco hurricane, which ruined the island on August 8, 1899; that during the first two years—1897 and 1898—they lived at Los Riegos, where her first two children were born. Subsequently, three months prior to August 8, 1899, they were moved to Barritos by instructions of don Manuel, and there San Ciriaco hurricane took them, and then "immediately" don Manuel moved them to some other place far from the house of don Manuel, where her two other children were born, possibly by 1900 and 1901, remaining there until don Manuel married on September 3, 1904, on which date Dolores Briganti and her lifetime companion moved to live to a house

across the house of don Manuel, in order that Dolores Briganti could be doña Ana's washerwoman.

This last statement is buttressed when witness Briganti testifies as to the place where she washed before and after don Manuel's marriage. She states that before don Manuel's marriage she did the washing at a brook further down from don Manuel's house, at about half a cuerda from the house (Tr. 1617); from Monday to Saturday (Tr. 1624); during the whole year of 1903 (Tr. 1624), and that after don Manuel left there (July or December, 1903), she did no more washing for the house until don Manuel married doña Ana at the end of 1904 (Tr. 1645), although she adds that she always had to do some washing because she washed her own clothes and that of the overseer (Tr. 1645). She affirms that she did the washing in the brook until don Manuel married doña Ana María (Tr. 1620); that when don Manuel married doña Ana—September 1904—since it was another kind of clothes, a better quality, she went to wash to Los Riegos (Tr. 1514).

The description of the love affair between Isilé Sanabria and Higinio Pérez made by witness Briganti is as follows: In 1903, at the beginning of the year, about February (Tr. 1630–1631), the witness saw many times that Isilé and Higinio "played the role of lovers", "that they embraced and kissed each other" (Tr. 1610–1611), in the morning as well as in the afternoon (Tr. 1617). She says that Higinio "played the role" in the stable (Tr. 1618), a stable close to the house of don Manuel (Tr. 1627) and Isilé "played the role" when she passed by the witness to fetch guinea eggs and shortly thereafter the witness would see Higinio go where she was going (Tr. 1618) by a road along that place (Tr. 1620) "they must have been doing something" (Tr. 1619). She says that the witness believes that "they must have been doing something" because she saw when one passed behind the other. "And the other behind. That is why."

(Tr. 1626.) She says that Isilé went for the guinea eggs in the morning (Tr. 1625) and that she watched the "role" of Higinio of kissing and embracing Isilé in the stable in the afternoon about six o'clock when the witness stopped her washing (Tr. 1627–1628); that the house of don Manuel could not be seen from the brook (Tr. 1627) nor the stable because the stable was close to the house of don Manuel (Tr. 1627).

Witness Briganti continues testifying that Isabel and Isilé remained in the house of don Manuel "for they remained *after*, previously, before don Manuel sailed for Spain in 1903 when he went to Spain and then they disappeared from the house of don Manuel and went to live to Besosa" (Tr. 1433); "for they *stayed* for the time in the home of don Manuel" (Tr. 1433). She adds that don Manuel had sailed to Spain in June 1903 (Tr. 1433). She states that after that she saw Isilé again in the house of Severo Sanabria, Isilé's uncle, on the way out from the farm of don Manuel to the main highway from Guayama to Aguirre (Tr. 1434). She says that she heard nothing more of Isabel, but after she left for Besosa, she saw Isilé, about two weeks later in the house of Severo Sanabria (Tr. 1538). She says that she passed by there to buy her groceries of every Saturday at a branch of the main store of the nephews of don Manuel, in Coquí ward (Tr. 1444); about a league from the house of Severo Sanabria (Tr. 1446). She says that then she asked Isilé who had brought her there and "she told me that she had come with Higinio Pérez, because she had gone away with him" (Tr. 1443). She states that in the house where Isilé was staying "I saw Higinio Pérez. At times I saw him upstairs; other times in the kitchen and then again in front of the road sitting on the steps" (Tr. 1446–1447). She says that shortly thereafter, in a few months, she had a *girl* of Higinio Pérez" (Tr. 1447); that she knows because the witness went in and out of the house—(once a week?)—

because Isilé was a very good friend of the witness (Tr. 1448). Led by the hand of her counsel rather than by her memory, she now testifies that what Isilé had was a *boy* named Luis who died three months after birth (Tr. 1448).

Witness Briganti continues testifying that Isilé was living in the house of Severo Sanabria about seven months (Tr. 1557); that seven months after *being* in the house of Severo Sanabria she went to the house of her brother Paco (Tr. 1560). According to this first calculation of her memory, she must have moved to Paco's house in January 1904. But immediately following she adds that she moved to Paco's house seven months after the boy had died (Tr. 1561). The testimony of witness Briganti does not agree with the documentary evidence as to the date of the death of Isilé's first child. According to the documentary evidence, Isilé's first child, named Luis, died on December 14, 1903. According to the testimony of witness Briganti, she saw Isilé's first child in the latter part of December 1903 (Tr. 1546) when he was about five days old (Tr. 1547) and that said child died when it was three months old (Tr. 1448). According to this second calculation of her memory, the child that was born in the latter part of December 1903, must have died in the latter part of March 1904 and the removal of Isilé to the house of Paco seven months after the death of the child, must have taken place in the latter part of October 1904, that is, four months before the birth of Juliana Sanabria, who was born on March 8, 1905.

There are indications in the testimony of the witness Briganti tending to establish that Isilé went to live in Paco's house in 1903 and not in 1904. She says that Isilé went to live at Paco's house before don Manuel arrived (Tr. 1562), and that after Isilé went to Paco's house, about three months later, don Manuel landed (Tr. 1563). The result of the foregoing testimony shows that don Manuel sailed for Spain between June or July 1903 and landed about September or

October, 1903. This statement of witness Briganti ratifies the testimony of Isabel González to the effect that her sister Isilé left Las Mareas sometime before the middle of September 1903 to go to Los Riegos. If this is so, the first child of Isilé Sanabria, named Luis, was born in September 1903 at the house of Isilé's brother, Paco Sanabria, and not at the house of her uncle, Severo Sanabria.

The testimony of witness Briganti is not clear on an important point in this case: until when did Isilé live in the house of Severo Sanabria. We know when she arrived because witness Briganti says that two weeks after the sisters left the house of don Manuel, she saw Isilé in Severo's house (Tr. 1538) and that "shortly thereafter, in a few months, she had a girl of Higinio Pérez" (Tr. 1447), which she later changed to a boy named Luis, the first child born to Isilé about the middle of September 1903. Witness Briganti does not remember the last time she saw Isilé at the house of Severo Sanabria (Tr. 1564–1567). Instigated on cross-examination she testified that Isilé "had seven months when she left there" (Tr. 1564). We do not know whether she meant seven months from the time she arrived in June 1903 at the house of Severo, in which case Isilé should have left the house of Severo in January 1904 or from any other time. Witness Briganti does not remember either whether she saw Higinio at the house of Severo the last time she saw Isilé there (Tr. 1563–1564). She says that the last time she saw Isilé in the house of Severo, Higinio worked in Fortuna de Gual (Tr. 1564) and that she (witness Briganti) "did not see him in the house of Severo" (Tr. 1565).

One of the attorneys for the defendant heirs attempted to establish the fact that Isilé continued in the house of Severo Sanabria with Higinio Pérez until she went to live in the house of Paco Sanabria, and twice witness Briganti evaded a categorical answer. The first time she simply testified: "He was the one who took her there, who moved

her there, *seven months* after the child was dead" (Tr. 1594). The second time when asked whether it was Higinio who sent her to Paco's house, she simply testified, referring to a bundle of clothes, "well she was going to send (for it) with him" (Tr. 1605). Witness Briganti testifies, however, that after Isilé left the house of don Manuel she never returned to it (Tr. 1602–1603).

The evidence is not clear as to whether Isilé Sanabria and Higinio Pérez lived together in the house of Severo Sanabria or Paco Sanabria. In the house of Severo, witness Briganti placed Higinio occasionally: "At times (Saturdays) I saw him upstairs, other times in the kitchen and then again in front of the road, sitting on the steps" (Tr. 1447). In the house of Severo there also lived, besides Severo, his wife Juana, Isilé and possibly, in the period of time covered by the testimony until September 1903, Isabel González, the natural daughter of don Manuel González. Doña Ana María, witness of the defendant heirs, states that the house of Severo was very small (Tr. 3350).

Witness Briganti states that she saw Higinio Pérez at Paco's house, "who was there every day" (Tr. 1461), but does not specify where. We know that Higinio Pérez did not live in Paco's house because according to witness Briganti, at Paco's there lived his wife (Fela Cartagena), Paco's brother-in-law (Alejandro Ramos Cartagena), Isilé Sanabria and her brother Paco (Tr. 1463–1464).

Witness Briganti herself says that Higinio Pérez, who was married to Pascuala Romero, an aunt of plaintiff's witness Francisco Romero, always lived in Fortuna de Gual (Tr. 1566) and kept his wife in Fortuna de Gual since he came to the farm of don Manuel (Tr. 1589). She also says, as we have previously noted, that the only man who set up a house for Isilé was Gaspar Carrillo (Tr. 1474).

The alleged paternity of Higinio Pérez of Isilé's second child, plaintiff herein Juliana Sanabria, is obtained by wit-

ness Briganti rather by deduction than by observation of the facts. Witness Briganti had testified that it was Higinio Pérez who moved Isilé to the house of her brother Paco Sanabria, "seven months" after the child had died (Tr. 1594). As we have seen, this must have taken place about the month of October 1904. She says that when she lived in front of don Manuel's house (Tr. 1638) "at a short distance" from don Manuel's house (Tr. 1638), Isilé passed by the house of the witness with Higinio Pérez and left a bundle at the house of the witness (Tr. 1603) and told the witness to send the bundle to her with Higinio the next day in the afternoon (Tr. 1604). She says that Isilé was carrying the bundle and that Higinio was not carrying any bundle (Tr. 1648). She says that it was Isilé who said about sending her the bundle next day to Paco's house, but that Higinio did not say anything (Tr. 1649). She states that at the house of Paco Sanabria "well, it happened that in 1905 she had Juliana Sanabria" (Tr. 1452). She presumes that Juliana is the daughter of Higinio because Isilé "passed by my house and left a bundle in my house" (Tr. 1603) so that "I could send it with Higinio next day in the afternoon" (Tr. 1604). She says that she saw Higinio "who was there every day (in Paco's house), who was the one I saw there every day" (Tr. 1461). This *being* there of Higinio Pérez must have been around the house of Paco, because according to witness Briganti, Higinio did not live in Paco's house.

This time Isilé did not tell witness Briganti who was the father of her daughter, as she alleges Isilé told her the first time when she met her at the house of Severo Sanabria. The alleged paternity of Higinio of Juliana Sanabria is inferred by witness Briganti from this *passing* of Isilé with Higinio Pérez in front of the house of witness Briganti and from having seen Higinio near the house of Paco Sanabria.

According to the only uncontroverted facts in our possession to organize this aspect of the testimony of witness

Briganti—the marriage of don Manuel to doña Ana María on September 3, 1904 and the birth of Juliana Sanabria on March 8, 1905—this *passing* of Isilé with Higinio by the house of witness Briganti must have been after September 3, 1904, when Isilé is already pregnant four or five months of her daughter Juliana. It is curious to note that this date coincides with the date in which, according to plaintiff's witness Francisco Romero, Isilé leaves the house of don Manuel to go to the house of Severo Sanabria.

The second version as to the possible paternity of Higinio Pérez is the one offered by the witness of the defendant heirs, Isabel González. Isabel says that some time after Juliana Sanabria returned in 1938 from the convent in Cuba, where she intended to take her vows, and when Juliana was already living with Isabel in the latter's house, don Manuel met Juliana at Isabel's house and when Juliana asked don Manuel to acknowledge her as his natural daughter, don Manuel answered that "he was not her father, that her father was a horse trainer" (Tr. 1053–1054). According to the evidence of the defendant heirs, Higinio Pérez was a horse trainer who worked for don Manuel. The witness continues testifying that sometime after hearing the conversation between don Manuel and plaintiff Juliana Sanabria, witness González wished "to make sure" whether Juliana's claim was legitimate and the witness asked don Manuel if Juliana was his daughter and "he told me that she was not his daughter" (Tr. 1209).

This statement is questionable when confronted with plaintiff's Exhibit II of rebuttal. It is a picture of Isabel González, admitted by the latter as hers (Tr. 1245) and given by the latter to Juliana (Tr. 1246). On the back of the picture it is autographed thus: "A remembrance to *my sister* S. M. R. from Isabel". The evidence shows that while a novice in a convent in Cuba, her religious name was Sor María San Raimundo (Tr. 535). Isabel González tes-

tified that, at least, she remembers that Juliana's name as a novice was "Raimunda" (Tr. 1248–1249 and 1250 *in fine*). She states that the treatment of "Sor" is equivalent to "sister" in religious parlance (Tr. 1249) and that in the letters wrote by Isabel González to Juliana while the latter was in the convent, she addressed her as "Sor" (Tr. 1250). But she does not remember whether her religious name was "María Raimunda" or "Raimunda" alone (Tr. 1248–1249).

It is not difficult to conclude that in full the autograph reads: "a remembrance to my sister Sor María Raimunda from Isabel". Witness González attempts to deny her autograph, first, by evasives; later, by denials. She begins by doubting that the handwriting is hers: "I *think* it is not my handwriting"; "I *think* it isn't. I never dedicate photographs to no one"; "I do not *remember* that I had written that. I told her to take one, but I did not write on it, because I never autograph any pictures" (Tr. 1247). Witness González admits that she wrote to Juliana when she was in the convent (Tr. 1248); but as to the autograph: "I do not remember having written anything. I was not in the habit of autographing pictures. This is not mine" (Tr. 1251–1252). She denies that she had signed "Isabel" as it appears in the picture: "Well, handwritings are imitated" (Tr. 1251), so that she does not recognize the signature in the picture "as my handwriting" (Tr. 1252). She says that she does not *remember* having written the word "Isabel" (Tr. 1253). Then a rather strange incident takes place. One of plaintiff's attorneys was cross-examining:

"Q. Please. Write here something I am going to tell you.

"MR. RIVERA ZAYAS: I wish to ask the court to instruct the witness that she may do it voluntarily.

"A. To where shall I write?

"Q. Write here 'Isabel'.

"MR. RIVERA ZAYAS: Instruct the witness that if she wishes to write it voluntarily she may do so, but if she does not wish

to do so, she may refuse. My colleague may ask the witness questions, but he may not ask her to write.

"JUDGE: All right.

"MR. QUIÑONES: Let her be instructed. If she does not write it, in some way she will want to.

"MR. RIVERA ZAYAS: *I have asked that she be instructed not to do anything that might incriminate her.*

"MR. QUIÑONES: But if she is telling the truth, how can she incriminate herself?

"MR. RIVERA ZAYAS: And if she refuses?

"WITNESS: I shall do whatever you say.

"JUDGE: If you wish to sign, sign.

"WITNESS: I do not wish to sign.

"Q. Nor write there what I am going to tell you to put there?

"A. What are you going to tell me?

"Q. I ask the lady to write the following there: "A remembrance to my sister Sor María Raimunda, from Isabel". Do you wish to write it in that paper?

"A. No, sir.

"Q. No, you don't want to write it. Come, Miss, presenting you this. That signature that is written there, whose is it?

"A. This one is mine, but not that one, I do not recognize it.

"Q. The one in the picture?

"A. The one in the picture.

"MR. QUIÑONES: The witness has just been shown page 19 of a Sworn Statement taken in the case in the Jury Room of the District Court of Guayama on April 30, 1948, before Master Dávila Monsanto, Mr. José M. Dávila Monsanto.

"Q. Tell me, you did not send any picture to Juliana to the Convent?

"A. I ...

"MR. RIVERA ZAYAS: One moment. Has colleague finished establishing that? We wish to state that it is unnecessary because this signature was put there by her in front of the Master and the question and answer are entirely unnecessary and we ask that it be stricken.

"JUDGE: Overruled.

"MR. RIVERA ZAYAS: This is an official document.

"JUDGE: But that does not deny the party the right to ask her if that is her signature. Go ahead.

880

"Q. And this picture that I am showing you now, and which you admitted that it was yours, and the autograph of which you deny ...

"A. Yes, sir.

"Q. Did you send this one to Juliana to the Convent?

"A. I do not *remember*. I know that she saw some pictures of me.

"MR. RIVERA ZAYAS: Objection. I am going to ask that the adverse party be instructed to limit the cross-examination. Several times she has answered that in her house ...

"JUDGE: Question is allowed.

"Q. Tell me, ins't it true that you sent Juliana a picture while she was in Cuba?

"A. Well, look, *I do not remember* if I sent it to her. Perhaps that was it; because I wrote to her as Sister in the Convent, because I have another friend who is a nun and I treat her like that, as Sister; and I do not treat her as Carola in the world, but as my dear sister, because the nuns must be treated like that.

"Q. Then, was this the one you sent her?

"A. *I guess so.*

"MR. QUIÑONES: For identification, Your Honor.

"A. She rummages through my wardrobe and looked at everything I had."

The trial judge did not compel Isabel González to reproduce in his presence the autograph nor the signature on it, undoubtedly impressed by the argument of self-incrimination. Of course, this buttresses the identification made by the plaintiff Juliana Sanabria of the handwriting of the sender (Tr. 3686) and the picture with the autograph, accepted as evidence by the trial judge (Tr. 3694), is a part of the facts proved in the case. From the very testimony of Isabel González it is inferred that that picture was sent to Juliana by Isabel while the former was a novice in the Convent in Cuba. This is strengthened by the treatment of "Sor" used in the autograph. Such treatment would not have any sense after Juliana had renounced to her vows, which is when for the first and only time Juliana goes to live in the house of her relative Isabel González.

Isabel González was not sure either whether the picture of don Manuel, presented by the plaintiff as given to her by don Manuel, as a souvenir of when he was young (Exhibit 4), had been obtained by plaintiff Juliana Sanabria in some subreptitious manner. Although counsel for the defendant heirs tried to obtain from her some statement in the sense that the picture might have been in possession of some relative of don Manuel, from whom Juliana might have acquired it, Isabel González merely answered: "Perhaps she (Juliana) might have a picture" (of don Manuel) (Tr. 1073), for which reason we have no other alternative but to consider, as a proved fact, that don Manuel gave his picture to Juliana before she left for the Convent in Cuba. The evidence offered by the defendant heirs in the sense that on the day that Juliana says she received that picture don Manuel was in San Juan, does not alter the fact of the possession nor excludes the possibility that she received it any other day.

Let us now turn to the examination of the evidence referring to the first years of Juliana Sanabria, particularly the period between March 8, 1905—date of her birth—and October 22, 1912—date of the death of her mother Isilé Sanabria. Plaintiff's evidence tends to establish that Juliana Sanabria lived in the house of Severo Sanabria until the death of Isilé, except for some periods of time that she spent in the house of her uncle Paco Sanabria. The evidence for the defendant heirs tends to establish that Juliana Sanabria lived in the house of Paco Sanabria until 1907 and thereafter in the house of Gaspar Carrillo, the last "husband" of Isilé.

As we have seen, the witness for the plaintiff, Francisco Romero, testified that in 1904, don Manuel took Isilé to the house of her uncle Severo Sanabria and that four or five months later, Isilé gave birth to a girl (Tr. 38), precisely on March 8, 1905. He now testifies that before Isilé gave birth to that girl, don Manuel passed by the house of Severo Sanabria, went in, took out his wallet and gave her money

882

(Tr. 39). Witness Romero says that he went out with don Manuel in the carriage in order to open the gates for him (Tr. 39) and while don Manuel alighted from the carriage, witness Romero stayed close to the horse, holding it (Tr. 40). Witness Romero says that after the girl was born, don Manuel "sent *someone* in the house to go there and sent her money and then, afterwards, about four or six days" (after the girl was born) don Manuel passed by the house of Severo and told Isilé: "Bring it here, I want to see if it is a boy or a girl" and she answered: "girl, it is going to be a '*chancleta*'" (Tr. 42). He says that then don Manuel kept going but later, another day, he passed (by the house of Severo) alighted and went into the house (Tr. 42). Witness Romero says that he saw don Manuel caressing the girl: "He patted the girl on the head and then, afterwards, he got into the carriage and turned back" (Tr. 43). Witness Romero continues testifying that he kept *seeing* Juliana until she was six years old, that is, until 1911 because the witness left the work of don Manuel in 1912 and never returned to the property of don Manuel (Tr. 43). According to witness Romero, during those years don Manuel gave money to Isilé: "He gave her money and helped her so that she (Isilé) could keep her (Juliana) then she (Isilé) was in the house of her uncle and he continued helping her" (Tr. 43) although "sometimes (Isilé) was in the house of Paco Sanabria and at other times in the house of Severo Sanabria" (Tr. 44). Witness Romero states that he knows that during those years don Manuel helped the girl "because I saw it . . . because I saw him caressing her and he passed by, sometimes he stayed, went back, got into the carriage and we went on our way" (Tr. 46).

This description of the relations between don Manuel and the girl, offered by witness Romero, must have been from 1905 until 1908, that is, until the girl was about four years of age, for according to the very testimony of witness Romero,

in 1908 he left the house of don Manuel and by instructions of the latter he moved to Fortuna to work, for which reason it may be inferred that he no longer went out with don Manuel in the carriage, although it is possible that he continued *seeing* Juliana until 1912 when he left the farms of don Manuel.

Plaintiff's second witness is plaintiff Juliana Sanabria herself, who testifies that she has known don Manuel in her house since she was "very little" (Tr. 447) while the witness lived in Coquí (Tr. 447) with her mother Isilé Sanabria (Tr. 447) in a house of Manuel González (Tr. 448), where there also lived her mother's uncle named Severo Sanabria (Tr. 448–449). Her first recollections of don Manuel seem to be that don Manuel took her out buggy riding and "threw quarters up in the air so that I could catch them and he caressed me and whenever he saw me climbed on a gate near my home, he stepped down from the carriage and spanked me and took me down from the gate" (Tr. 451–452). She says that she saw don Manuel "almost every week; once or twice he went" (Tr. 452) and sometimes she saw him in the house, while the witness was inside the house (Tr. 452–453), besides Juana Vázquez, the wife of her uncle Severo, her uncle Severo and her mother (Isilé Sanabria) (Tr. 453). She states that one time, at least, don Manuel went into the room and stayed there some time (Tr. 454–592) and on coming out he caressed the witness and left (Tr. 454). She says that don Manuel kept going to that house "until six or seven years that I lived here (until) my mother died" (Tr. 456). She says that when her mother died —October 22, 1912—the witness was about seven years old (Tr. 457).

As to plaintiff's support, she testifies that don Manuel gave money to her mother or to Juana Vázquez who was the one that assisted Isilé when she gave birth to Juliana (Tr. 457) and that it continued like that until Isilé died (Tr.

458). She says that after Isilé died, don Manuel went to a house of her uncle who still lives (Paco Sanabria) and since the witness was wearing a colored dress, don Manuel asked her why was she wearing a colored dress (Tr. 459) and she did not know what to answer and then don Manuel told her that his wife, doña Ana, would have some mourning dresses made for her (Tr. 459) and a few days later the dresses were sent to her (Tr. 460).

Plaintiff says that her mother died in the house of her brother, Paco Sanabria (Tr. 460), and that she remained in the house of Paco Sanabria (after her mother's death) (Tr. 461). She states that some time later don Manuel told her that "he was going to send her to Cristina Curet so that she be taken care of and learn in the school and that he would give her everything she needed" (Tr. 461).

On cross-examination, plaintiff testified that sometimes she was taken to the house of Paco Sanabria, where she spent weeks, once in a while (Tr. 584–585) and that she had been in the house of Paco about a week when her mother died (Tr. 586). She says that it is impossible for her to determine which was the longest period of time that she spent in Paco's house (Tr. 587) although she remembers that when her mother died she had been for one week in Paco's house (Tr. 587), "but at other times I cannot say the length of time we spent there" (Tr. 587). She states that in the house where she lived with her mother, "there also lived Severo, who died, but I have a very vague idea of Severo. My mother stayed there with Juana, Severo's wife, his wife who took care of me and with whom I spent most of the time. Since she took care of me she was always with me" (Tr. 588).

Plaintiff continues testifying that she remembers don Manuel since she was five years old—since 1910—then "since I can remember, you know that when a child is impressed or something calls his attention he remembers it" (Tr. 589);

although she cannot state accurately what happened from the first time that she remembers having seen don Manuel —according to her mental calculation since 1910— (Tr. 457–589) until her mother died (1912), since "I could not say exactly whether a year and a half or two years elapsed; approximately from the first time until my mother died" (Tr. 590).

As to her two other brothers who were born after wit-ness, she says that she did not know them (Tr. 593) and that she "was alone, entirely alone and I lived entirely alone until my mother died" (Tr. 594). She says that Juana Vázquez was at all times with her (Tr. 594) because her mother occasionally went away: "I cannot say what she did because I was under the care of Juana Vázquez, the wife of my mother's uncle" (Tr. 594). She says that she can-not remember whether her mother spent the year when she (Isilé) died (1912) with the witness (Tr. 595), but she can say that she (Isilé) went away, but she cannot say for how long without telling a lie (Tr. 596). She says that she did not see her mother have the relations of husband and wife with Alejandro Ramos Cartagena (Tr. 597). According to the stipulation between the parties, the relations between Isilé and Alejandro—if any, says the stipulation—were at the end of 1907 or at the beginning of 1908. In these years, plaintiff Juliana Sanabria was about two or three years old. The evidence does not reveal the date when Nemesio was born, the alleged son of Isilé and Alejandro Ramos, her brother-in-law's brother. She says that she learned of Nemesio "after I came from Cuba (1938) because I was sent to the Colegio de las Monjas and I was never taken to Salinas to meet my family until recently that I have gone to Salinas" (Tr. 598). She testifies that she did not know of her mother's son before she was born (Tr. 600) and she did not meet or ever saw in her house Rafael Gaspar Carrillo (Tr. 602), nor saw the daughter of Isilé with Gaspar

886

Carrillo, named Olympia (Tr. 602). She states that there were two sons of Paco and doña Fela at Paco's house and at the house of Juana Vázquez there was no other man after Severo died (Tr. 603).

She states that she did not find out who brought her the mourning dresses (Tr. 607) and that she does not know if it was don Manuel (Tr. 607). She says that she saw don Manuel when he gave her money to Juana or to her mother and that she remembers it since she was five years old until she was seven (Tr. 609), that is, from 1910 until 1912.

The witness for defendant heirs, Dolores Briganti, had testified that Isilé stayed quite a long time at the house of Severo (Tr. 1449), according to her own calculations, until October 1904, and later Isilé went to live to the house of Paco Sanabria at Los Riegos (Tr. 1449 and 1561) and that there (at Paco's house), "it happened that in 1905, well, she had Juliana Sanabria" (Tr. 1452). Now she testifies that Isilé continued living at Paco's house "until the girl was about a year and some months old" (Tr. 1456), that is, until 1906 and some months, although subsequently she testifies that Isilé lived at Paco's house "until Julia was two years and some months old" (Tr. 1563), that is, until 1907 and odd months, when at that time, in 1907, mother and daughter went to live with Gaspar Carrillo (Tr. 1583) who was the only man that set up a house for her (Tr. 1474). According to the facts stipulated, the sexual relations between Isilé and Alejandro Ramos Cartagena, if any, began at the end of 1907 or at the beginning of 1908, allegedly in the house of Paco Sanabria, where both lived, according to witness Briganti. We do not know the date when Nemesio was born, but from the stipulated facts it may be inferred that he must have been born at the end of 1908 or at the beginning of 1909. So that the mental calculation of witness Briganti, as to the date when Isilé began to

live with Gaspar Carrillo, is contradicted by defendant's own evidence.

Making use of the only uncontroverted fact in our possession as to the love affair between Isilé and Gaspar Carrillo—the birth of their daughter, Olympia, born April 1, 1912—said love affair must have commenced between the months of June or July 1911, on which date Olympia was conceived. Of both dates—1907 or 1911—it seems to us more advisable to choose the latter as the date when Isilé went to live with Gaspar Carrillo, the conflict of the evidence, therefore, being reduced to determining whether Juliana lived with her mother at the house of Gaspar. Carrillo or at the house of Juana Vázquez, the wife of Severo Sanabria, between 1907 and 1911.

The witness for the defendant heirs, Ana María Hernández widow of González, testified that at the end of 1904 and in 1905 she went out with don Manuel to see some pasture farms for the grazing of cattle, they went to "Fortuna," "Besosa", later named "Florida," "Aguirre", where she lived with don Manuel, "Rosales," "Sabater," "Teresa" (Tr. 3348). She says that the road in and out of their house was near Coquí and Coquí was in the estate Aguirre (Tr. 3348). She states that during those years there was also an exit through Sabater or through Fortuna (Tr. 3349), but the entrance which was mostly used when she was married was through Coquí (Tr. 3349). She says that the person in charge of watching the entrance gate from the road to the farm where they lived was Severo, the uncle of Isabel Sanabria (Isabel González) (Tr. 3349), who lived in a small house at the very entrance of the road, next to the gate, because he (Severo) had the key (Tr. 3349). She adds that the person carrying the key to open the gate was Severo himself "otherwise Juana, his wife was called Juana" (Tr. 3349). She states that when they passed by "they always talked (don Manuel and she) with both of them"

(Tr. 3350). She says that she did not know of any other adult person living with Severo and Juana, nor of any girl (Tr. 3350). "I do not believe that any one lived there, because it was so small . . . the house was very, very small" (Tr. 3350).

From the incursions made by doña Ana María to the farms of don Manuel, the cross-examination compels us to deduct certain periods of time during which she was traveling, either alone or together with don Manuel. She begins testifying that at sometime between September 3, 1904 —date of her marriage with don Manuel—and July 4, 1905 —date of the birth of their first son Manuel (Tr. 3391)—she made a trip to the United States to continue towards France and Spain "without children or anybody, just Manuel and myself" to take Rafael González to a sanatorium (Tr. 3383–3384) although, later, she seems to fix this trip in the year 1907 (Tr. 3386). If it was between 1904 and 1905, this first trip of hers coincides sufficiently with the trip remembered by witness Briganti, who testified that after the two sisters left the house of don Manuel, the latter sailed away and returned in 1904. If it was in 1907, there is no sense to the descriptive term "without children or anybody" for at that time her first son, Manuel, was already born. Of the two versions, the one that seems most spontaneous is the first one, in the sense that that was her first trip (1905) (Tr. 3385–3386 and 3394).

The version of the trip made in 1905 is better formalized. As to this trip, doña Ana María testified that in 1905, when her son Manuel was born—July 4, 1905—she was a little weak and then went to Spain (Tr. 3383) in September (Tr. 3389) or October (Tr. 3391) of 1905, sailing with only her maid and the boy (Tr. 3389) and her mother (Tr. 3383) and returning to Puerto Rico at the end of 1906 (Tr. 3389). She says that don Manuel went to get her in May 1906 (Tr. 3391) and that he stayed spending the summer with his

mother (Tr. 3389), that is, from June 25, 1906 to September 25, 1906, which period consists of the summer season, both returning at the end of 1906 (Tr. 3389). According to this part of her testimony, doña Ana María leaves Puerto Rico in September or October, 1905 and returns to Puerto Rico about September or December, 1906, while don Manuel leaves Puerto Rico in May 1906 and returns to Puerto Rico between September and December 1906.

She says that during the lifetime of don Manuel's mother, and the latter lived during the whole period covered by the examination of this period, she and don Manuel went to see his mother every year (Tr. 3382–3390), they left at the end of the harvest (May) (Tr. 3393–3394) and returned at the beginning of the crop season. She testifies that during the first year of her marriage, for at least five months each year, she was not at the farm of Salinas and that it was don Manuel who stayed at the farm (Tr. 3394). There is evidence, outside of these regular trips to Spain, of other trips to the United States in 1907 and 1908 (Tr. 3381) and that in 1909, due to an illness of doña Ana María's mother, don Manuel left the harvest and everything and went with doña Ana María's mother and his wife to Spain, from which trip don Manuel returned in August 1908, while doña Ana María stayed until the beginning of 1910, when Ana María's father went to get her (Tr. 3393–3394). She states that in 1910 she gives birth to her first and only daughter, who dies in 1911 (Tr. 3384) and that in 1911 she went to the United States, when her husband was thinking of buying Covadonga (Tr. 3388) and continues to Spain where her other son, Guillermo, was born—June 26, 1912—and from there she returns directly to Puerto Rico in 1912 (Tr. 3392).

Of the possible incursions of doña Ana María through the farms of her husband, we must also eliminate certain working periods during which don Manuel must have been unable to leave in the carriage to make a round of the farm

with his wife, doña Ana María. As we have seen, don
Manuel left for Spain in May and returned at the begin-
ning of the crop season. From the very testimony of doña
Ana María it appears that the crop season was quite hazard-
ous for don Manuel and that he left the farm only at lunch
time (Tr. 3400) on horseback (Tr. 3401) and sometimes
they sent the lunch to him at the place where cane was being
loaded (Tr. 3401).

There is likewise a part of her testimony in which doña
Ana María testifies that she did not go through El Coquí,
the place where Severo lived until 1906 (Tr. 3404) which
was the time when the planting of cane was begun. She
says that after Sabater was leased, after she was married,
"perhaps six, four, two, five years" after her marriage, the
way out most frequently used was through Fortuna (Tr.
3410) because then there were three ways out "through El
Coquí, which was eliminated and then through Sabater and
Fortuna" (Tr. 3410). She says that they used most fre-
quently the Fortuna road because it was the better road
(Tr. 3411). Now she seems to correct herself in part and
says that during her first three years of marriage (1904–
1907) there was no other way out except through El Coquí
(Tr. 3412), but she insists that the Fortuna road was re-
paired when they began the planting of cane in 1906 (Tr.
3413). If this is so, the period of time strictly in which
she could have passed through El Coquí would have been
September 3, 1904 until 1906.

Comparing the last four testimonies there arises the un-
controverted fact that during the years 1905 to 1912, Severo
Sanabria and his wife Juana Vázquez lived in Coquí ward,
in a house belonging to Manuel González. As to the disputed
fact of who lived in the house of Severo during that same
period of time, the statements of plaintiff Juliana Sanabria,
and plaintiff's witness Francisco Romero, that Isilé Sana-
bria lived in the house of Severo with her daughter Juliana

during those years, is contradicted by the statement of doña Ana María, that during her first three years of marriage with don Manuel, when the entrance from Coquí was still used, she did not see any adult person, except Severo and his wife, or any child, living in the house of Severo Sanabria, and by the witness for the defendant heirs, Dolores Briganti, who testified that after October 1904, Isilé lived with her daughter Juliana in the house of her brother Paco, until 1907 and some months, and after Isilé took her child to the house of Gaspar Carrillo until Isilé died in 1912. Her statement that after 1907 Isilé and her daughter Juliana went to live to the house of Gaspar Carrillo is in turn challenged by the defendant heirs' own evidence, who attempt to establish that at the end of 1907 Isilé begins to have a love affair with the brother of her brother-in-law, Alejandro Ramos Cartagena. In the final conclusions of the case we shall decide this conflict between the evidence of both parties.

The time elapsed between the years 1912 and 1919, that is, from the death of plaintiff's mother on October 22, 1912, until the plaintiff goes under the care of doña Ana María Hernández, at some time between June and August 1919, presents three conflicts of evidence which we propose to examine under a strict system: (1) in what places does the plaintiff live during those years and for how long; (2) in what schools and up to what time does plaintiff study during that same period of time; (3) which are the acts of acknowledgment which are attributed to the predecessor of defendant heirs, to his wife or to his natural daughter Isabel González. As up to now, we shall try to stress specifically the facts which appear corroborated by the adverse evidence.

1. Plaintiff Juliana Sanabria testified that when her mother died "don Manuel told me that he was going to take me to Cristina Curet to take care of me . . . and that he would give her (Cristina) everything I needed" (Tr. 461). Now she testifies that don Manuel told her that after the rosaries

(Tr. 462). Since Isilé died on October 22, 1912, the rosaries must have ended at the beginning of November 1912. Then this conversation between don Manuel and Juliana must have taken place in the first days of November 1912.

Plaintiff continues testifying that Cristina went to get her and took her to Guayama to a place situated on the road out from Guayama to Arroyo and went to live at a place called Hoyo Inglés (Tr. 462–463). She says that she did not spend a whole year in Guayama, only *a school year* in 1913 (Tr. 463). This agrees with the testimony of Isabel González, in the sense that Juliana stayed "very little" in Guayama "only a few months" (Tr. 1020). Plaintiff adds that don Manuel told Cristina to return to the farm because plaintiff could attend school there (Tr. 468) and at the end of the *school year* they went to Húcares (Tr. 468).

Plaintiff says that they returned to a farm of don Manuel near Sabana Llana ward to a big house where Juan Colón lives with his wife Juana Velázquez (Tr. 469) and that the house belonged to don Manuel González (Tr. 470). She further says that plaintiff lived there (in the house of Juan Colón) under the custody of Cristina Curet for two school years (Tr. 471). She states that she stayed in Húcares for two years "almost but not quite two years, that is, two *school years*" and then they went to live to an estate called Sabater, belonging to don Manuel González, in the town of Salinas (Tr. 479), in which place (Sabater) she lived with Cristina "for more than three years" (Tr. 480) until 1919 (Tr. 486); then, from July 1916 until July 1919.

As to the first part of plaintiff's testimony, referring to the time that plaintiff Juliana Sanabria spent in Guayama, the only direct attack to the statements of witness Sanabria contained in the evidence of defendant heirs, are the testimonies of María Curet and Sabad Reyes Aponte. Witness Curet says that she went to see Cristina at the house of don Manuel and then: "she (Cristina) already had the little

girl (the plaintiff) in the house of don Manuel and she (Cristina) introduced me to the wife of don Manuel" and "later in the course of a few days Cristina agreed to take the child to my house because she could not keep her in the work" (Tr. 1786–1787). According to the testimony of doña Ana María, in her trip with don Manuel to Spain in 1912, when her son Guillermo was born in Barcelona on June 26, 1912, don Manuel arrived at Barcelona during the first days of June and returned to Puerto Rico in September or October, 1912 (Tr. 3203), while doña Ana María returned in December 1912 or in January 1913, when her son Guillermo was about six months old (Tr. 3203). Reconciling the evidence of defendant heirs we must conclude that this visit of the witness Curet to the house of don Manuel when "she (Cristina) already had the little girl" and "she (Cristina) introduced me to the wife of don Manuel" must have been in December 1912 or in January 1913. The exact date in which plaintiff Juliana Sanabria arrives at the house of witness Curet remains floating in the air at the mercy of a vague phrase: "in the course of a few days" (Tr. 1786). Witness Curet adds that after she saw the child (plaintiff), in the house of don Manuel, when Cristina brought the plaintiff, she said: "I bring you this little girl, who is the daughter of a *comadre* of mine who died (Isilé, who died on October 22, 1912) and she gave her to me but I cannot keep her in the work and I would always help you" (Tr. 1780). Most probably, plaintiff arrived at the house of witness Curet in December 1912 or January 1913. Witness Curet ratified this conclusion when she testifies that the witness is not sure whether the child was brought to her house in 1912 or in 1913 (Tr. 1750).

The date in which plaintiff Juliana Sanabria leaves the house of María Curet in Guayama to go to the farm presents another conflict in the evidence between the testimony of Sabad Reyes Aponte and María Curet, both witnesses

for the defendant heirs. According to Sabad Reyes he met the plaintiff Juliana Sanabria, "when she was *small*" in the estate Sabater (Tr. 1842) where she lived with Cristina Curet (Tr. 1844) and although he does not remember well in which years (when he met her as a *small child*), it could have been "about nineteen thirteen, something like that" (Tr. 1843) and adds that after 1913 the witness continued seeing the plaintiff "shortly thereafter" (Tr. 1844). Plaintiff testifies that in one of the visits that she made with Cristina to the house of don Manuel (in Sabater) she saw Sabad Reyes "only once . . . outside . . . near the dairy" (Tr. 636–637) and she and Cristina waited until don Manuel spoke to Sabad Reyes so that they could then speak with don Manuel (Tr. 637). Witness Reyes knows that Juliana went to school because he saw her as she left with the children of Antonio Santiago (Tr. 1855). According to the evidence of the defendant heirs, this must have taken place after July 1916, as we shall see hereinafter.

Witness Reyes continues testifying that he went very little to Sabater (Tr. 1874) and very seldom saw Cristina greeting don Manuel because "I saw her very seldom because I went there very seldom to work and it was very few times that don Manuel also came" (Tr. 1886–1887). He says that "*I saw* Juliana when she was small there, that she arrived there" (Tr. 1888) ; she must have been about eight or nine years old (Tr. 1888). According to the date of birth of Juliana, this must have happened in 1913 or 1914. However, the witness admits that between 1914 and 1915 he was ten months without work, confined to his home, because he had broken his leg (Tr. 1893) and at that time he did not know where Juliana was (Tr. 1894).

On the other hand, witness for the defendant heirs, María Curet, states that plaintiff Juliana Sanabria arrived at the house of the witness when she was a small child about seven or eight years old (Tr. 1729)—1912 or 1913— and

that she believes that Juliana "might have been (in the house of the witness) more than two years or perhaps less than two years" (Tr. 1730) (1912–1914 or 1913–1915), but she remembers that Juliana left the house of the witness before the witness got married on May 14, 1914 (Tr. 1731–1732 and 1751). Later she testifies that she is not sure whether the girl was brought to the house of the witness in 1912 or in 1913 (Tr. 1750), but remembers that when Cristina took Juliana from the witness' house, Juliana had finished her second grade (Tr. 1755–1768).

If this is so, Sabad Reyes could not have seen the plaintiff living in Sabater in 1913, because she lived in Hoyo Inglés. Most probably he saw her at some visit that plaintiff made to the house of don Manuel together with María Curet, according to plaintiff's testimony (Tr. 1735–1736). The testimony of witness Curet categorically indicates that Juliana left the house of María Curet at some time prior to May 14, 1914 (Tr. 1732).

2. According to the plaintiff, at the end of the school year in May 1913, she and Cristina went to Húcares (Tr. 468), an estate of don Manuel near Sabana Llana ward (Tr. 468–469), to a big house where Juan Colón lived with his wife Juana Velázquez (Tr. 469) and that the house belonged to don Manuel (Tr. 470). The witness says that she and Cristina lived there for *two school years* (Tr. 471). According to the testimony of plaintiff herself, these two school years would correspond to the school years 1913–1914 and 1914–1915. Plaintiff's witness, Juana Velázquez, wife of Juan Colón, corroborates plaintiff to the effect that Cristina and plaintiff lived with the witness and her husband in the big house in Húcares for *three years* (Tr. 237).

Plaintiff's witness, Eladio Acosta Sánchez, also corroborates plaintiff's testimony in the sense that the latter studied in a school of Sabana Llana ward in Salinas (Tr. 87). This must have been during the school year 1914–1915, because

at the time of testifying on May 4, 1948, witness Acosta said that he was forty-two or forty-three years old, since he was born between 1906 and 1907 (Tr. 87) and says that he went to school in Sabana Llana for the "first grade when he was seven or eight years old" (Tr. 92). Plaintiff's witness, Pedro Cruz, says that he has known plaintiff before 1914 in the school of Sabana Llana (Tr. 279–280) and that when Juliana was in school in Sabana Llana, Juliana lived in Húcares (Tr. 281) and he saw her in the house of Juan Colón (Tr. 303).

The evidence of the defendant heirs tries to prove that after Juliana left the house of María Curet in Guayama, at sometime before May 14, 1914, Juliana went to live to estate Sabater of don Manuel González, to a tenement known as the "airplane".

It is advisable to specify, a little more, the moment in which, according to defendants' evidence, Cristina leaves the house of don Manuel González and goes to live to Sabater to a tenement known as the "airplane", owned by Manuel González. Ana María Hernández, the wife of don Manuel, testifies that "Cristina must have been my cook about the time my daughter died" (Tr. 3452). According to doña Ana's own testimony, there are two possible dates for the death of her daughter, in 1910 (Tr. 3452) or June 1911 (Tr. 3199). She says that after the death of her daughter, Cristina became ill and "then we gave her a room in the 'airplane' to keep her near, so that she could come in case my cook should leave" (Tr. 3452). She says that when she states "we gave her a room in the 'airplane' " she means she and don Manuel (Tr. 3452–3453), and that "sometimes when we did not have a cook (Cristina) would come and help me . . . and not much because she (Cristina) was ill" (Tr. 3453).

She says that Cristina asked her permission to open a dining place and that she and her husband (Cristina's) made

their living on that business (Tr. 3453) although it was not actually a dining place: "they cooked meals and served them to the laborers. It is not actually a dining place" (Tr. 3454). Previously doña Ana María had described the dining place in the following manner: "it always had bottles of *maví* for sale and fritters and things like that" (Tr. 3422). We must make clear that the rest of the evidence does not show that Cristina had a husband, at the time to which doña Ana María refers (Tr. 1803–1804). Possibly doña Ana mistook the case of the wife of Severo, Juana Vázquez, with that of Cristina.

Witness Curet testifies that Cristina took plaintiff to her house after she ceased cooking in the house of don Manuel (Tr. 1732). It is not clearly established by defendants' evidence exactly when it was that Cristina left the house of don Manuel. According to the testimony of doña Ana María, Cristina must have left her house about 1910 and 1911. According to the testimony of María Curet, Cristina must have left at the beginning of 1913 (Tr. 1780). Witness Curet testifies that when Cristina entrusted her with the child "she (Cristina) was in the house of don Manuel and could not keep the girl until she left the job and then decided to rent a room in Sabater and live there and all that time while she was working as a cook I had the child" (Tr. 1780). If we are to give credit to the testimony of Antonio Santiago (father), witness for defendant heirs, he was the one who "founded" the tenement (the airplane) in 1914 (Tr. 2290–2291) and that Cristina went to rent a room there to work "and I gave her a room in the airplane when it was finished" (Tr. 2291). It seems that this happened in the latter months of 1914 (Tr. 2321) possibly after October (Tr. 2307).

The testimony of doña Ana María shows that the "dining place" of Cristina in the airplane was established as soon as Cristina left her house. Witness Curet testifies that

after Cristina left her job in don Manuel's, she went to the
"airplane", but the witness does not know whether she started
the dining place immediately (Tr. 1782). According to
the testimony of María Curet, Cristina had the business in
Sabater, during two periods of time: one, after she left the
house of don Manuel and another, before witness Curet mar-
ried on May 14, 1914. According to this testimony, during
the first period, 1913, plaintiff Juliana Sanabria did not live
with Cristina in Sabater (Tr. 1734–35, 1755 and 1780) but
with María Curet in Hoyo Inglés in Guayama. It is during
the second period that Juliana goes to live with Cristina in
Sabater, possibly in the first months of 1914 (Tr. 1765–66).

The two witnesses of defendant heirs, Antonio Santiago,
son, and Antonio Santiago, father, at the beginning of their
testimony insinuate a period of time—beginning of 1914—
which would establish the solution of continuity with the
testimony of witness Curet which determines the stay of
plaintiff Juliana Sanabria in Hoyo Inglés, until sometime
prior to May 14, 1914. Witness Antonio Santiago, son, be-
gins by testifying that he knew Juliana in Sabater, "from
1914 until 1919" (Tr. 2245) ; that "from and after" 1914
(Tr. 2246), from the month of March 1914, that is, two
months after January 1914 (Tr. 2266) and ends by accept-
ing that he does know where Juliana lived in 1914 because
"it was after the old woman Cristina went to ask for a
room" (Tr. 2267) and that Cristina arrived at Sabater at
the end of 1914 and the witness does not know where Cris-
tina and Juliana lived prior to that date (Tr. 2267). Accord-
ing to witness Santiago, son, Cristina went to ask for the
house where she would live with Juliana at the middle of
1914 and the witness' father did not give her the house at
that time but at the end of 1914 he gave it to her (Tr. 2268).

Witness Antonio Santiago, father, begins his testimony
by saying that he arrived at Sabater at the beginning of
1914 (Tr. 2307) and, a few months after he arrived at Saba-

ter (Tr. 2310), about a month and a half (Tr. 2311) when the witness was already finishing the tenement (the airplane) (Tr. 2311), the witness gave a room to Cristina, who immediately moved with the girl, Julia, "who was about ten or eleven years old" (Tr. 2312) and ends by accepting that he arrived at Sabater in the latter months of 1914 (Tr. 2321) in October 1914 (Tr. 2307).

Thereafter, the other Santiago, witness for the defendant heirs, Miguel Santiago, a brother and son respectively of the other two Santiago witnesses, testifies that his father, Antonio Santiago, went to work in Sabater in 1914, in the first months of 1914 and then, at the end of 1914 they moved his father to Florida (Besosa) (Tr. 2326) and they remained in Florida until the month of July 1916 (Tr. 2327). He says that he met plaintiff Juliana Sanabria at Sabater in 1916 (Tr. 2324); that he does not remember having seen Juliana in the tenement in 1914 (Tr. 2330), although he did see her in 1916 (Tr. 2331) nor did he see Cristina in Sabater at the end of 1914 (Tr. 2341). On the basis of this testimony we must conclude that the Santiago family did not come to Sabater at the beginning nor at the end of 1914 (after October), but in the middle of the year 1916 (after July).

3. From the previous analysis it may be considered as an undisputed fact that plaintiff Juliana Sanabria attended her first school year in Guayama. We have seen that this school year could not have been in 1912–1913 as claimed by plaintiff, and up to a certain point, witness Curet, but rather the school year 1913–1914. This being so, there remains to be determined in which school and until when did Juliana study during the school years 1914–1915 and 1915–1916.

Plaintiff Juliana Sanabria testifies that don Manuel told Cristina to return to the country because the girl could go to school there (Tr. 468). That at the end of the term they went to Húcares (Tr. 468) and then plaintiff began her

second grade in a school situated in Sabana Llana ward (Tr. 474) "previously they were very inferior schools" (Tr. 628 and 641) but that she did not have to cross the river to go to school (Tr. 628). She says that there was another school across the river but she never went there (Tr. 644). From the testimony of Eladio Acosta (Tr. 96) and Juan Colón (Tr. 1694) we know that the other school was situated in Buena Vista, beyond the river. She says that while she lived in Húcares, "almost but not quite two whole years, that is, two school years" (Tr. 479), "she stayed two grades during both school years because much time was wasted as the teacher was in love with a Spaniard and spent all the time talking to him and we wasted a lot of time" (Tr. 478). This phrase "two grades during both school years," has no other possible explanation except that during both school years, 1914–1915 and 1915–1916, plaintiff was in the same grade, the second grade, possibly without passing. From the description made by her of the school "a small school with two sections, three rows of desks and a lane (aisle) in the center and three rows of desks" (Tr. 642), with the low second grade on one side and the advanced second grade on the other side (Tr. 642), it seems that in said school each grade was divided into two sections, one which was considered "low" and the other one which was considered "advanced" (Tr. 642), although both were supervised by the same teacher (Tr. 643), according to the plaintiff, Miss Silva (Tr. 643–629), although she cannot say whether she studied with Miss Silva the first or second year after she came to Sabana Llana (Tr. 629). We have said that possibly Juliana did not pass her advanced second grade, because she herself also testifies that when she began to go to school in Coquí —in Sabater in 1916, as we have seen— "I again went to the second grade and then they passed me to the third and to the fourth grade" (Tr. 480–481). The version that she again went through the second grade when she went to the

school in Coquí is corroborated by Antonio Santiago, son (Tr. 2247), and Miguel Santiago (Tr. 2345–2346), both witnesses for defendant heirs.

The assertion of plaintiff Juliana Sanabria in the sense that she attended rural schools in Sabana Llana ward is corroborated as a whole by the testimony of Juana Velázquez, Pedro Cruz and Eladio Acosta. The only contradictions that we have found in plaintiff's evidence refer exclusively to the period of time during which the plaintiff studied in the rural school of Sabana Llana. According to plaintiff's own version, she studied in said school during the school years 1913–1914 and 1914–1915 and that it was in 1915 she moved to Sabater (Tr. 631). But she also says that she lived in Sabater with Cristina "more than three years" (Tr. 480) until 1919 (Tr. 486). The evidence of both parties coincides as to the fact that Juliana left Sabater in 1919 and went to a private school or asylum in Ponce (Tr. 2245–3494). The only conflict between both evidences is whether Juliana entered the school at the end of September 1919 (Tr. 493), as averred by plaintiff, or prior to June or July, 1919, as affirmed by Ana María Hernández: "They bring her to me, *I take her*, I mean, I send her to the Orphans' then after a month, that must have been in *June or July*, because I sent her immediately, I met her today and she left next day, and a month later went the other one, Carmen Maneiro . . . and then I did not return because I sailed away in August (to New York) to take my children and I stayed there" (Tr. 3494). So that we shall have the same result if we organize the testimonies from the undisputed fact of the death of Isilé (October 22, 1912) or from the undisputed fact of when Juliana left Sabater (June to September 1919): Juliana lived in Húcares from 1914 to 1916 and in Sabater from 1916 to 1919.

Witness Juana Velázquez does not refer to any period of time. She merely testifies that while Juliana was in

Húcares she went to school in Sabana Llana (Tr. 240). Witness Eladio Acosta Sánchez merely testifies that he studied in a school in Sabana Llana ward in Salinas and there she met a schoolmate whom they called *"la gallega"* (referring to Juliana) (Tr. 87–88). Witness Acosta says that he began his "first grade when he was seven or eight years old" (Tr. 92). Witness Acosta, upon testifying on May 4, 1948, stated that he was forty-two or forty-three years old (Tr. 87). According to this he must have been born in 1905 or 1906, and while attending the first grade "when he was seven or eight years old" it must have been between 1912 and 1914. Possibly witness Acosta attended school in Sabana Llana before plaintiff did, for subsequently he testifies that while the witness was in the third grade with Miss Silva and in the fourth grade with Mr. Ocasio, the plaintiff was in the second grade with the same Miss Silva (Tr. 95), and that in that same classroom witness passed to the fourth grade and changed to another school "to the center of Buenavista . . . on the other side of the river" (Tr. 96). The fact that the same teacher should teach more than one grade in the school of Sabana Llana is corroborated by the testimony of Miss Silva herself (Tr. 1374–1376). There is no doubt that witness Acosta studied in the rural schools of Sabana Llana, and it is so corroborated by defendants' own witnesses, Serafín Pabón (Tr. 1291–1292) and Josefa Silva (Tr. 1383–1384 and 1386). The conflict might arise as to the period of time during which witness Acosta studied in said schools.

Plaintiff's witness, Pedro Cruz, testifies that he saw plaintiff Juliana Sanabria, prior to 1914, in the school in Sabana Llana (Tr. 279), a school which was situated "in the very center of Sabana Llana, on the edge of the road from Salinas to Cayey" (Tr. 279–280). Witness Cruz says that at that "time" —before 1914— Juliana must have been eight or nine years old (Tr. 279–280). According to the

date of birth of Juliana —March 8, 1905— this must have been in 1913 or 1914. Witness Curet corroborates this statement of witness Cruz, for the former testifies that when the plaintiff went to live to the house of witness Curet, Juliana was a girl about seven or eight years of age, "she was very small, she did not talk well" (Tr. 1729–1730). According to the date of birth of Juliana, this *must have* been in 1912 or 1913. The witness Cruz says that "that time" he met Juliana in school "for a short time" because witness' family went to Sabater, when the witness' mother died in 1914 (Tr. 280–281) and later, from 1916 until 1918, he saw Julita (Juliana) and Cristina in Sabater, in the "airplane" (Tr. 294). Since the month of the year 1914 in which witness Cruz went to Sabater is not known, nor the exact date when his mother died, we do not know whether that descriptive term "for a short time" is included or not in the school year 1914–1915, the first year in which Juliana attends the rural school of Sabana Llana, according to the testimonial organization we have made from the two undisputed facts we use: the death of the mother of Juliana in 1912 and the enrolment of Juliana in the School or Asylum of Ponce in 1919.

The impeachment of plaintiff's evidence as to the place where she studied and the period of time during which she studied in that place, is accomplished by defendant heirs by means of the testimony of Sabad Reyes, Serafín Pabón and Juan Colón, the latter son of plaintiff's witness Juana Velázquez. Witness Reyes testified to having seen Juliana "when she was small" in the estate Sabater (Tr. 1842) and although he does not remember well the years (when he met her small) it might be "about nineteen hundred thirteen, something like that" (Tr. 1843) and after 1913 he continued seeing her "shortly after . . . in the same place Sabater" (Tr. 1844). He states that he knows that Juliana went to school because he saw her go out to school with the children

of Antonio Santiago (Tr. 1855). As we have said, the very evidence of defendant heirs shows that Juliana starts going to the school in Coquí with the children of Antonio Santiago after July 1916. So that the testimony of Sabad Reyes does not impeach the corrected statement of plaintiff's witnesses, in the sense that she attended the school of Sabana Llana ward from 1914 to 1916, because the testimony of witness Reyes refers to the period in which Juliana is in Sabater, that is, from 1916 to 1919. Although there are two witnesses of the defendant heirs who situate Cristina in Sabater before 1916—Ana María and María Curet—the heirs' own evidence situates Juliana from 1913 to 1914 in Hoyo Inglés in Guayama.

Witness Serafín Pabón, when testifying on June 22, 1948, said that he was forty-three or forty-four years old (Tr. 1266) ; he must have been born then in 1904 or 1905. He states that he started going to school at seven years of age (1911 or 1912) in the rural school of Sabana Llana (Tr. 1285), in which school he studied from the first to the fourth grade (Tr. 1267). From the rest of his testimony it is inferred that he studied his first grade during the school year 1912–1913; his second grade in the school year 1913–1914; his third grade in the school year 1914–1915 (Tr. 1267–68, 1265–70). He says that during the school year 1915–1916 he left school because he went to Cayey (Tr. 1270), returning during the school year 1916–1917 to study his fourth grade (Tr. 1267–1268). And after the fourth grade (1917) he went to town to study (Tr. 1289).

As it will be remembered, Juliana studied in the rural school of Sabana Llana during the school years 1914–1915 and 1915–1916. According to the testimony of Serafín Pabón, it is only during the school year 1914–1915 that he had the opportunity of seeing whether or not Juliana studied with him in the school of Sabana Llana, for during the

school year 1915–1916, witness Pabón goes to Cayey, and he returns in September 1916 to study his fourth grade in Sabana Llana, Juliana had already moved from Húcares to Sabater, and Juliana is studying in the school in Coquí. Perhaps this was what induced Serafín Pabón to confess to plaintiff's counsel, when the latter were preparing the evidence for the plaintiff, that the person who knew whether Juliana studied in the school of Sabana Llana was plaintiff's witness Eladio Acosta (Tr. 1304–1306, 1311–1312) who studied in the rural school of Sabana Llana during that "time" (Tr. 1306), accepting that he could not say whether a girl named Juliana Sanabria was in the second grade (Tr. 1914–1915) while the witness was in the third grade (Tr. 1301), although he can affirm that Juliana did not study with him (in the third grade) and he did not know her while she studied in the country (Tr. 1301).

Witness Juan Colón, son of Juan Colón and Juana Velázquez, the latter plaintiff's witness, contradicts the testimony of his own mother, as to that neither Cristina Curet nor Juliana lived in the house of his father Juan Colón in Húcares (Tr. 1688–1689). His testimony on this point is seriously weakened on cross-examination. A time comes when he testifies that he could not say the years during which he lived in Húcares (Tr. 1713); that afterwards he went to live with his grandparents and from his grandparents' house he does not know where he went to live (Tr. 1714). In the midst of his testimony he had a collapse, became unconscious and the judge had to call a recess (Tr. 1709–1710). We do not know whether because of moral compunction in having to contradict his mother, or for any other reason, on certain occasions "his memory is blocked".

On the witness stand on June 24, 1948 he testified that he was forty-eight years old (Tr. 1673). If this is so, he must have been born in 1900. He says that before working in Fortuna, when he was eighteen years of age (1918, then)

(Tr. 1708) he studied in the school of Sabana Llana his first, second and third grades (Tr. 1680), three *straight years*, although he does not remember the years (Tr. 1681). He says that he was twelve years of age when he began to go to school (Tr. 1682). He states that he studied the first grade in the school in Buena Vista, a ward of Sabana Llana, "at the end of the road" (Tr. 1694). If this is so, his first school year must have been in 1912–1913. According to the rest of the evidence, the school in Buena Vista was located, not on the edge of the road, but "on the other side of the river" (Tr. 96), and Juliana studied in the school in front of the road and not in the school which was on the other side of the river (Tr. 628).

He testifies that he studied the second grade in a house at a distance from the place where he studied the first grade (Tr. 1698), a zinc-roofed frame house fronting the highway (Tr. 1683). If this is so, his second school year must have been in 1913–1914 and the school where he studied, the same school where Juliana studied. As to the third grade, he begins by testifying that he studied his third grade in the same place where he studied the second (Tr. 1702), but instantly he testifies that he does not remember anything about the third grade (Tr. 1703); he says that he studied the third grade but does not remember where (Tr. 1706).

This being the net result of his testimony as to his school years, what seems most probable within the narrative sequence is that Juan Colón studied in the rural school of Sabana Llana during the *straight* school years 1912–1913 and 1913–1914, on the basis of the age when he begins to go to school, according to him, at the age of twelve, or during the school years of 1916–1917 and 1917–1918, on the basis of the date when he stops going to school to go to work in Fortuna, according to him, at the age of eighteen.

Comparing the testimony of Juan Colón with that of his mother Juana Velázquez, the most probable thing is that these two school years were those corresponding to the school years of 1915–1916 and 1916–1917. Juana Velázquez testified that at the time that Julita was in the house in Húcares, which was the time when their eldest son (Juan Colón) went to school (Tr. 247) and then went together to the school, on foot in the mornings, but at noon her son stayed in the house of his grandfather, Pilar Colón, who lived in Sabana Llana and then Julita returned alone (Tr. 248). In the testimony of Juan Colón we confirm the existence of his grandfather (Pilar Colón), to whose house Juan Colón went to live after he left Húcares (Tr. 1713–1714).

Upon framing this set of facts from the only undisputed fact in our possession, the death of plaintiff's mother, Isilé Sanabria, on October 22, 1912, what seems most probable is that plaintiff Juliana Sanabria arrived at the house of María Curet in Hoyo Inglés of Guayama in January 1913 and studied in Guayama her first grade during the school year 1913–1914, from September 1913 until May 1914; that few days prior to May 14, 1914, she left Hoyo Inglés and went to the house of Juan Colón in Húcares and studied her second grade, in a school in Sabana Llana, on the edge of the road, during the school years 1914–1915 and 1915–1916, going then to live in Sabater in a tenement known as the "airplane" where she lived until the year 1919.

3. As to the acts of acknowledgment that may be attributed to the predecessor of the defendant heirs, don Manuel González, to his wife Ana María or to the natural daughter of don Manuel, Isabel González, the plaintiff testifies that while she lived in Hoyo Inglés, in the house of María Curet, don Manuel gave plaintiff everything she needed, clothing, shoes and food (Tr. 464) for which he gave the money to Cristina (Tr. 464). Plaintiff says that when she lived in Guayama with Cristina, she came out to the

country and brought the witness so that don Manuel could see her (Tr. 465). The witness of the defendant heirs, María Curet, corroborates this statement when she testifies that during the time that Cristina was in the witness' house (two or three months) "she never went out", although she adds that Cristina "went there (to the house of don Manuel) and then came back (to the house of the witness) to stay" (Tr. 1735).

Plaintiff states that don Manuel gave money to Cristina, in the presence of the witness, and gave it to her in bills (Tr. 465) and that at that time the only thing that Cristina did was take care of the plaintiff (Tr. 466). She says that during that school year she saw don Manuel in Sabater (Salinas) "about three or four times in the school year during that time" (Tr. 466) and "there were times when we saw him in the same house because that lady (Cristina) brought me so that doña Ana could see me" (Tr. 466). The witness of defendant heirs, María Curet, corroborates in part these statements of the plaintiff when she testifies that the money for the plaintiff was given to Cristina (Tr. 1731–1734, 1778–1779), sometimes Cristina "sent five, eight or ten dollars, even more, she gave me" and then "with what she gave me I bought shoes and clothing for the child to go to school" (Tr. 1778–1779). Witness Curet also testifies that while Juliana lived in her house, Cristina also lived in witness' house for a while, "she once went to my home to rest, because she did not like living in Hoyo Inglés, *because she had no opportunity to work* and once she went home to take a rest and stayed for a period of two or three months, and then definitively when she (Cristina) became tired she came here (Sabater) and brought the child, she took charge of her" (Tr. 1734–1735). As we have previously seen, in a visit made by María Curet to Cristina in the house of don Manuel, witness Curet saw Juliana together with Cristina

in the house of don Manuel, and in that same visit, Cristina introduced her to the wife of don Manuel (Tr. 1786–1787).

Plaintiff goes on testifying that don Manuel "had a way of playing with me and called me 'Taruga', she knows how to read and patted my head and was in the habit of unbuttoning my dress to look at my back...because I had a beauty mark in my back like the one he had, and he always said that if I got lost he could find me because of the beauty mark" (Tr. 467–468).

Plaintiff says that when she lived in Húcares, in the house of Juan Colón, don Manuel used to go two or three times a week to Húcares, called the witness and she came out, he would take her by the hand "mounted her on the horse and gave her a ride" (Tr. 471–472). She says that when don Manuel had to give money to Cristina and the latter was not there, he sent plaintiff to get her (Tr. 472) and when Cristina came, don Manuel gave the money to Cristina, "once or twice a month, and particularly when I needed money for clothing" (of the witness) Cristina asked don Manuel for it in the presence of the witness, alleging that plaintiff ruined many shoes (Tr. 473). She says that "during that time" —her stay in Húcares from 1914 to 1916— Cristina did nothing else but take care of the witness (Tr. 473). She says that when she went to school in Sabana Llana, "she was always well-dressed and *sometimes* I met don Manuel on the road and he took me to school . . . in the carriage" (Tr. 474) and on *some occasions* when she returned home (to the house of Juan Colón), don Manuel met the witness on the road and brought her home (Tr. 475). She says that while she lived in Húcares, during the first year she went alone to the school in Sabana Llana and she was nine years old (Tr. 649)—in 1914, then— and that during the second year she sometimes went with the son of Juana Velázquez, named Juan (Tr. 650).

Plaintiff states that don Manuel asked Juana Velázquez "if I was behaving and to watch me and see that Cristina did not neglect me and to take care of me" (Tr. 477). She says that she drank a lot of milk because don Manuel told Juan Colón to keep a cow for the plaintiff (Tr. 477) and when Juan Colón milked his cows, to milk plaintiff's at the same time (Tr. 478). She tells that the first cow given to her was called Carolina and was very tame (Tr. 478).

Plaintiff testifies that from Húcares they went to live in estate Sabater, a property of Manuel González in Salinas (Tr. 479) and in Sabater they went to live in a big house divided in two, the first division where the laborers slept, and the other section, which was incommunicated, was where don Manuel asked Cristina to live with the witness (Tr. 480). She says that while she lived in that place don Manuel supported plaintiff, he went "very often there and called Cristina and gave her money for my food" in the presence of the witness (Tr. 481) and that Cristina was the one that took care of her clothing and gave personal attention to the witness (Tr. 482). She says that while the witness lived in that place—more than three years (Tr. 480)—don Manuel went twice or three times a week, either in the carriage or on horseback (Tr. 482) and when the witness wished to buy something extra, instead of asking Cristina for it, she asked don Manuel (Tr. 483). She says that once don Manuel gave her three one-dollar bills, and that she (Juliana) gave a party in the school (Tr. 483).

Plaintiff goes on to say that she stayed in Sabater until 1919 (Tr. 486), finishing the school year of 1919 (Tr. 493) and then don Manuel told her "that I was going to go with them" (Tr. 486) to send her to a nun school and few days later doña Ana María went for her (Tr. 486) and took her to the house of don Manuel (Tr. 487). She says that she stayed in the house of don Manuel from the end of the school year in 1919 (May or June) until the end of September

(Tr. 493). She says that while she stayed there, in the house of don Manuel González, doña Ana María "showed me how to pray, she taught me how to pray every night and in the morning she showed me how to mark and darn, so that when I went to school I would be skilled" (Tr. 488). She states that she ate in the dining room with the children of don Manuel and doña Ana (Tr. 494) and slept "in a room next to the room of Pepito and Manolo" (both sons of don Manuel and doña Ana María) (Tr. 496). She says that don Manuel never told her in front of doña Ana that plaintiff was his daughter (Tr. 666) and that the witness noticed that if don Manuel was affectionate with the witness, doña Ana "made faces" (Tr. 666).

Testifying for the plaintiff, Juana Velázquez, wife of Juan Colón, says that one day while they lived in the big house in Húcares (Tr. 234), don Manuel arrived at the house of the witness and told her husband to give Cristina and Juliana a room in the house (Tr. 236); and a week after having spoken to don Manuel, Cristina and Juliana moved to the house in Húcares (Tr. 236). Witness Velázquez says that don Manuel passed by every week, on his way to Barritos, "he sounded the bell of the carriage and then Cristina and Julita would come out to speak to him" (Tr. 236). She says that the witness saw don Manuel giving money to Cristina every week when Cristina and Julita lived in Húcares for three years (Tr. 237). She says that don Manuel did not go into the house, he stayed in a big porch next to the kitchen (Tr. 239) and one day he called Julita and unbuttoned the dress of the girl to see a beauty mark that Julita had, and then he said: "that if the girl gets lost he would find her by the beauty mark" (Tr. 239). The witness says that she was present when don Manuel caressed Julita, and patted Juliana's head (Tr. 240).

Witness Velázquez says that at that time Cristina was not engaged in any work, she had nothing of her own,

except the money that don Manuel gave her (Tr. 242). This is corroborated by the testimony of the witness for the defendant heirs, María Curet, who testified that when her aunt Cristina went to the house of the witness to rest, she had nothing and the dining place had been closed down (Tr. 1764). Witness ·Velázquez goes on to say that every time that don Manuel came to Húcares he told the witness to take care of Julita and to see that she did not play with boys, because "the girl was of his own blood" (Tr. 242). She says that don Manuel had given orders to her husband (Juan Colón) to give Juliana a cow and "when that cow had no milk he would send another one" (Tr. 243). She says that Julita went to school on foot but that "on many occasions" don Manuel brought her in his carriage and left her at her house (Tr. 244).

Testifying for the plaintiff, Eladio Acosta said that while he studied in a school in Sabana Llana ward in Salinas (Tr. 87) he saw don Manuel on two or three occasions taking Juliana down from a carriage in front of the school and then when don Manuel turned his head and left, they began to shout at Juliana *"gallega"*, *"gallega"* (Tr. 90–91). There is no doubt that this witness studied in the school of Sabana Llana from and after 1914 or 1915 (Tr. 92). Defendant heirs' own witness testified likewise, as we have seen.

Testifying for the plaintiff, Pedro Cruz, a cousin of the witnesses for the defendant heirs, Antonio Santiago, son, and Miguel Santiago (Tr. 312) stated that he knew Juliana for a short time in 1914, when she lived in Húcar and studied in Sabana Llana (Tr. 279–281). He says that he knew her for a longer period from 1916 until 1918 (Tr. 294) when she lived in Sabater (Tr. 281). He says that in Sabater, Juliana lived with Cristina Curet (Tr. 282) in a high house called the "airplane" belonging to don Manuel González (Tr. 281) where the laborers who worked there lived and slept in one part, and in the last two rooms, which fronted

the road from Ponce to Guayama, Juliana Sanabria lived with Cristina Curet (Tr. 282).

Witness Cruz continues testifying that he saw don Manuel around there (in the "airplane") "several times he went there, at times he called, that he did not see Julita, who was called *gallega*, he called Cristina and asked for her, if she was not there, he called her" (Tr. 283). He says that when Cristina called her, the girl (Juliana) came to the carriage where don Manuel was (Tr. 292). He says that Julita "got close to the carriage and many times he took her hand like this and she went into the carriage (Tr. 292–293) and don Manuel "then caressed her" (Tr. 293). He says that he saw "that" about the caresses two or three times (Tr. 294). He says that he saw Julita and Cristina in the airplane since 1916 until 1918 (Tr. 294) because on July 29, 1918 he had to go to the army, but when he was discharged in 1919, he again saw Juliana in don Manuel's house (Tr. 294) "about twice" (Tr. 295). There is no doubt that witness Pedro Cruz worked in Sabater during the years 1916 to 1918, and worked again in 1919, as stated by defendant heirs' own witnesses, Antonio Santiago, son (Tr. 2262) Antonio Santiago, father (Tr. 2303), and Miguel Santiago (Tr. 2335).

Testifying for the plaintiff, Ángel Ramón Zayas, a cousin of Mr. Rafael Rivera Zayas, one of the counsel for the defendant heirs, stated that he had arrived at Salinas in 1916, at the estate Sabater, where he worked as clerk (pay-roll clerk) (Tr. 149). He states that "almost immediately" he met Cristina Curet (Tr. 149) and since the first day when he went out to work, upon returning from the rounds in the morning, he saw the girl Julia in the porch of her house and he stopped the horse "because of the great resemblance . . ." (Tr. 150). He says that the girl Juliana Sanabria lived together with Cristina Curet "in a long lean-to, in the southern part next to the big irrigation canal"

(Tr. 152). He tells that the girl was "more or less ten or twelve years old" (Tr. 152). In 1916 plaintiff Juliana Sanabria was eleven years old.

He says that Julita and Cristina lived of what don Manuel gave Cristina for the support of Julia (Tr. 153) and he knows this "because I saw it with my own eyes" (Tr. 154). He states that he heard when don Manuel told Cristina "take this for the support of both of you, of my daughter and yourself" (Tr. 154). He says that "numberless times" don Manuel stopped his carriage, called Cristina "if he did not see her, or if she did not see him, Cristina would come to talk to don Manuel and he would ask for his daughter and Cristina called Julita, saying 'come here to your father'" (Tr. 154) and then Julita would get into the carriage, don Manuel "took her, kissed her, embraced her, and did what I did with my children when they were her age" (Tr. 155).

Witness Zayas says that he witnessed that for about a year and a half, until he was changed to another estate, and then he saw Julita occasionally, in the same estate Sabater (Tr. 155), and then saw her in the house of don Manuel, living there "as of the family" (Tr. 156). He says that he saw Juliana in the house of don Manuel in 1919 (Tr. 164) because "I went to collect my salary at the office, other times I went to get tickets at the office, other times I went to make loans on my salary, and other times I went to take the payroll to the estate to make the payments" (Tr. 165). He says that he saw the plaintiff "together with don Manuel and doña Ana" and in the house there was also Ramón, Guillermo, Jorge, Luis, children of don Manuel and doña Ana (Tr. 166). He states that he saw the plaintiff in the house of don Manuel "several times, two or three times I saw her there" (Tr. 167). Although the witness could not see the son of don Manuel and doña Ana, Jorge González, because he was born in New York on March 24, 1920, the rest of

the children named were already born and were in Puerto Rico (Tr. 3179).

Witness Zayas goes on to say that he saw don Manuel on several occasions taking the child in the carriage, "he went to Aguirre, to the estate, took her and at times he did not return and at times (she) did not return nor did he, since he had other estates to take care of" (Tr. 156). Witness Zayas says that when don Manuel passed by Sabater it was working time, but since the witness was a clerk "I had to come to the office after making a round" (Tr. 188), because his "work as a clerk was to make rounds and take note of the people who were working, I had to return to cut tickets for the workers to buy at the store" (Tr. 189); other times "I returned to the 'switch' and had to take care of the people at the 'switch' and at times I even had to weigh the cane" (Tr. 189). This point of the testimony of witness Zayas is corroborated by the witness for the defendant heirs, Miguel Santiago, who testifies that he saw witness Zayas several times talking to don Manuel in front of the office at Sabater, very seldom (Tr. 2351). There is no doubt that witness Ángel Ramón Zayas was in Sabater during the years 1916 to 1919, as stated by defendant heirs' own witnesses, Antonio Santiago, son (Tr. 2283) Antonio Santiago, father (Tr. 2300) and Miguel Santiago (Tr. 2329).

The evidence to the contrary offered by the defendant heirs consists of the testimony of doña Ana María Hernández, Serafín Pabón, Juan Colón, María Curet, Sabad Reyes, Antonio Santiago, son, Antonio Santiago, father, Miguel Santiago, and Julia Beltrán.

Doña Ana María testifies that during the years 1913, 1914, and 1915, she does not recall having known a squatter by the name of Juan Colón (Tr. 3351). She says that she might have seen the plaintiff "without knowing that her name was Juliana" among other children in the estate Sabater (Tr. 3420), but that she and her husband, don Manuel,

passed along by the place where Cristina lived (Tr. 3421) and although she knows where Cristina lived, she never stopped to talk to Cristina (Tr. 3422). There is nothing in the evidence to indicate that doña Ana María passed by Húcares between the years 1914 to 1916, on which date plaintiff Juliana Sanabria lived in Húcares. As to the years 1916 to 1919, when the plaintiff lives in Sabater, we know that from 1916 to October 1918 (date of the earthquakes) doña Ana María lived in New York (Tr. 3495). Her adverse testimony would cover exactly from October 1918 to August 1919.

Doña Ana María goes on testifying that she did not go by car to Sabater to get the plaintiff (Tr. 3213) and that don Manuel did not go with her to get the plaintiff. She states that the plaintiff never lived in the house of the witness, nor had lunch or supper or slept a single day in the house of the witness (Tr. 3203–3204), although she might have slept on some occasion at the Beltrán's, certain employees who lived in the servants' quarters in her house (Tr. 3204). The witness says that she never taught plaintiff to embroider, to do lace work, nor to darn, because she did not know her and she would not have had the time for it (Tr. 3206).

She testifies she is sure she met the plaintiff in 1919: "I knew her. They bring her to me, *I take her*, I mean, I sent her to the Orphans', then after a month, that must have been about June or July, because I sent her immediately, I met her today and she was gone the next day" (Tr. 3494). She says that no one intervened in sending Juliana to the asylum "no one but myself, for charity sake" (Tr. 3195) and that she would have never permitted her husband to intervene in her charity work (Tr. 3195–3213). She says that her husband never asked her to do anything for Juliana and that the witness did not know whether he knew the girl she was going to protect (Tr. 3196).

The testimony of Serafín Pabón merely tends to contradict the testimonies of Juana Velázquez and Eladio Acosta, plaintiff's witnesses, on the point of whether don Manuel took plaintiff to school in his carriage. Witness Pabón says that he remembers having seen don Manuel making the rounds in the farm which was located around there (Sabana Llana), but that he never saw him with anyone in the school (Tr. 1271), although he remembers having seen him around there, alone (Tr. 1271–1272). As we have previously noted, his testimony is limited to the school year 1914–1915, for during the other school year that Juliana spent in Sabana Llana, 1915–1916, the witness goes to Cayey (Tr. 1309–1310).

Witness Juan Colón says that neither in the house of his parents at Húcares, nor at the school in Sabana Llaña, he met any girl who answered to the name of Juliana Sanabria, and although the witness knew don Manuel, he never saw him taking a girl to the school in his carriage (Tr. 1686–1689). By the analysis previously made of his testimony, his adverse statement would be limited to the school year 1914–1915, the first of the two only school years that Juliana studied in a rural school in Sabana Llana.

Witness María Curet testified that her aunt Cristina helped her sister Justa, mother of the witness (Tr. 1731). She says that when Cristina cooked at the house of don Manuel, the witness "came to ask her (Cristina) the protection which she (Cristina) gave me (Tr. 1783). She states that when Cristina helped only her sister Justa and her niece, witness María Curet, Cristina gave them seven, four, five (dollars) "according to what she could afford" although "sometimes she even gave ten dollars" (Tr. 1778). She says that one day Cristina "took the child (Juliana) so that we should leave with the girl and she (Cristina) would help us" (Tr. 1731). She tells that after the girl arrived, Cristina "sent five, eight or ten dollars, even *more*,

she gave me" and then witness Curet says "with what she (Cristina) gave me, I bought shoes and clothing for the child to go to school" (Tr. 1778–1779).

Witness Curet continues testifying that after Cristina ceased cooking in the house of don Manuel (Tr. 1782), she decided to rent a room in Sabater (Tr. 1780) in the "airplane", a house of don Manuel (Tr. 1783–1784) but the room was given to her free (Tr. 1783–1784). The witness says that she does not know if when Cristina went to live at the "airplane" she set up the dining place immediately (Tr. 1782), but it was "after she ceased cooking for the house of doña Ana" (Tr. 1783).

Witness Curet continues saying that afterwards (without doubt, after setting up the dining place for the first time) Cristina became ill (Tr. 1761) and left Sabater and went to the house of the witness Curet to recover (Tr. 1762) and at the house of the witness she stayed two or three months (Tr. 1763). She states that during those two or three months that Cristina stayed in the house of the witness in Hoyo Inglés, "the dining place had been closed down, she had *nothing* and then she went to recover her health because she was ill" (Tr. 1764). Witness Curet tells that while Cristina was in her house, Cristina told the witness that she was losing much money in the business because she had no one to help her and then the witness told her: "Since the girl (Juliana) has had schooling, you can take her so she can take care of the accounts" and that then Cristina brought plaintiff to Sabater (Tr. 1755) and set up the business again when she returned (Tr. 1764). She says that Juliana left the house of the witness before the latter married, that is, before May 14, 1914 (Tr. 1732), although the witness does not remember whether it was at the end or before the school year (Tr. 1755).

The witness states that after Juliana was brought to Sabater, Cristina had another dining place and gave food

to the laborers (Tr. 1735 and 1764) and that that was after the witness had the girl in her house (Tr. 1736), that is, after May 1914. She says that Cristina "sent the same person who made the purchases to make a note" of what he had purchased "and it was there that she (Cristina) had the losses and she complained very much" (Tr. 1756). Witness Curet says that Cristina showed the notebook to the witness where the laborers charged what they took and then she (the witness) saw when a laborer took fourteen cents and charged five (Tr. 1757). The witness says that she *discovered* that they charged less on many occasions, because when the witness visited Cristina, the latter gave her the notebook for her to examine. She says that that *discovery* (the fact that the laborers charged less than what they took) might have been from *1915 to 1916*, which were the years when the witness visited Cristina with her husband (Tr. 1758). She says that the dining place of Cristina was a "lousy" thing and Cristina "was losing very much" (Tr. 1783).

Witness Sabad Reyes testified that he saw don Manuel González in Sabater that "he passed by there; making his rounds" and spoke to the overseers (Tr. 1852). He says that as to the persons who lived in the tenement (the "airplane"), "well, he arrived there, stopped and talked to anyone who arrived there, unimportant things" (Tr. 1853). He says he did not see don Manuel directly visiting Cristina nor Juliana (Tr. 1854) although don Manuel "went there, stopped and sometimes talked with her (Cristina) and immediately went away, not making conversation with her" nor with Juliana "nothing that I saw" (Tr. 1854). He says that he knows Juliana was going to school because he saw her go out with the children of Antonio Santiago (then, after *1916*, on which date the Santiagos arrived at Sabater) (Tr. 1855) and that he never saw don Manuel taking Juliana to the school (Tr. 1856). The date in which don Manuel

occasionally took Juliana to school in his carriage, according to plaintiff's evidence, was when Juliana was in the school of Sabana Llana, that is, during the school years 1914–1915 and 1915–1916.

He states that he never saw don Manuel give money to Cristina nor to Juliana in his presence (Tr. 1857–1858) and that in his presence he never saw Cristina bringing Juliana to talk to don Manuel (Tr. 1859). He says that his house was within the same property of don Manuel in a part called Los Riegos, quite at a distance from Sabater (Tr. 1873) and that he worked in all the estates (Tr. 1870) and when he was in another estate he did not know what was going on in Sabater (Tr. 1874). He tells that he went to Sabater least of all (Tr. 1874) and that the few times that he was in Sabater he saw don Manuel around there (Tr. 1885) and when don Manuel came, Cristina "would look out, greet him and would return again to her work" (Tr. 1885). As it will be remembered, Sabad Reyes stayed ten months, between 1914 and 1915, without work because he broke his leg (Tr. 1893).

Witness Antonio Santiago, son, testifies that from and after 1914 he met the plaintiff Juliana Sanabria, who lived in Sabater in a tenement of workers with Cristina Curet, her godmother, "who was in charge of her" (Tr. 2246). The witness says that they lived in Sabana Llana until 1914 and "about the month of *January 1914* the old man ('Antonio Santiago, father) was already in Sabater and about *two months later* we also went" (Tr. 2266). He states that he does not know where Cristina lived in 1914 because it was after Cristina asked for the room (in the workers' tenement) (Tr. 2267). He says that Cristina came to Sabater at the end of 1914 and he does not know where Cristina and Juliana lived before that (Tr. 2267). He says that Cristina asked the witness' father for a room (Antonio Santiago, father, overseer) (Tr. 2267) in the *middle* of 1914

and the witness' father did not give it to her until the *end* of 1914 (Tr. 2267–2268). The witness says that in 1915, the witness was no longer living in Sabater (Tr. 2269). He says that a month after Juliana arrived at Sabater, they (the witness' family) left Sabater and went to live at Besosa until July 1916 (Tr. 2269–2270) and he knows nothing of the life of Juliana from the end of 1914 until July 1916, he does not know whether don Manuel went to the house of Cristina nor the relations that might have existed between don Manuel and Cristina and don Manuel and Juliana (Tr. 2270).

He says that in Sabater, the old-lady Cristina had a small business there because she lived very poorly. "She made coconut candy and gave meals to some workers there, and made lollipops which she sold for two or three cents" (Tr. 2252). He says that he never saw don Manuel give any money or anything to Cristina or to Juliana (Tr. 2254) although "after a while" —then, after July 1916—of Juliana being in Sabater, someone talked to don Manuel to give some milk to Juliana and she went with the witness to get the milk (Tr. 2263–2264). He tells that he never saw don Manuel speaking to Juliana nor ever saw him in the house of Cristina, nor talking to her (Tr. 2252). He says that doña Ana María passed in an automobile to Sabater but never stopped (Tr. 2265).

Witness Antonio Santiago, father, testifies that *it seems to him* that it was *at the beginning* of the year 1914 that he began to work in Sabater (Tr. 2290) ; later he says that it was at the beginning of the year in October 1914 (Tr. 2307) ; finally he testifies that he arrived at Sabater in the latter months of 1914, not at the beginning, but in the latter months (Tr. 2321). He says that he did not take his family with him immediately (Tr. 2291) but "after one or two months" (Tr. 2309). He states that he stayed in Sabater about three or four months and later he was sent to Besosa until July 1916 (Tr. 2295). According to this statement of witness

Santiago, father, the only period of time that he spends in Sabater, in 1914, is from October to December 1914.

He testifies that he himself founded the tenement (the airplane) "and a private house there" (Tr. 2291). He says that Cristina Curet went to ask him for a room there to work—giving meals to the workers (Tr. 2310)— "and I gave her a room in the same airplane when it was finished" (Tr. 2291). He says that that was during the first months, about a month and a half when the witness was finishing the tenement (Tr. 2311). This contradicts the statement of doña Ana María in the sense that already in 1910 or 1911, don Manuel and she gave a room to Cristina in the airplane. He says that when the witness gave the room to Cristina, she immediately moved with the little girl Julia, who was about ten or eleven years old (Tr. 2312). According to witness' observation, this must have been in 1915 or 1916, at the time that Juliana was that age. Later he says that in 1914 Cristina came to Sabater, "not Juliana because I did not notice, but Cristina" (Tr. 2319). He says that after he gave Cristina the room, the witness told don Manuel "and he (don Manuel) told me no; that he wanted that for the workers of Yauco, but then he said, if it is done, leave her there" (Tr. 2293). He says that don Manuel went to Sabater once or twice a week (Tr. 2296) on working days at about nine or ten o'clock in the morning (Tr. 2297). He states that he never saw don Manuel "give money to the women" to live (Tr. 2293) nor saw him visiting Cristina (Tr. 2294), nor taking Juliana in his lap (Tr. 2294). This must have been after July 1916, for we have seen that in 1914 the witness stayed only two months in Sabater, and at that time the tenement had not even been finished, it was finished about a month and a half after witness Santiago came to Sabater.

Witness Miguel Santiago testifies that he knew the plaintiff Juliana Sanabria in Sabater in *1916* (Tr. 2324).

He says that prior to 1916 he had not met her and that in 1914 he did not see her nor did she live in Sabater (Tr. 2330) and, likewise, he does not remember having ever seen Cristina in the tenement in 1914 (Tr. 2330), although he did see her (Cristina) in 1916 (Tr. 2331). He states that Cristina "lived from her business, selling bread, candy and giving meals outside" (Tr. 2333). He says that they (Antonio Santiago, plaintiff Juliana Sanabria, and the witness) went to school at times only in the morning and at other times only in the afternoon (Tr. 2353). He says that when their turn was in the morning they had to leave at six thirty or seven o'clock, because they had to be in class at eight o'clock (Tr. 2354). He says that he saw witness Ángel Ramón Zayas speaking to don Manuel "several times, like that, rarely", in front of the office of Sabater (Tr. 2351). He says that he did not see don Manuel giving any money to Cristina or to Juliana, nor did he see don Manuel caressing Juliana (Tr. 2334). He says that Juliana went to get the milk together with them (Antonio and Miguel) early in the morning, almost dark, before dawn (Tr. 2335).

Witness Julia Beltrán testifies that she knew plaintiff Juliana Sanabria in the dairy of don Manuel González (Tr. 2361). She says that the witness saw when the plaintiff passed by every morning to get the milk "sometimes she passed at four o'clock, with that Arab" (an Arabian who passed in a jitney to buy milk) but "when she came on foot she passed by at five o'clock in the morning" (Tr. 2380–2381). She says that it was occasionally that Juliana passed by at four o'clock in the morning in the jitney of the Arab, and although the witness did not see her, the father of the witness told her whenever Julieta passed by in the jitney of the Arab (Tr. 2382). She says that the delivery of milk ended from seven to half past seven or eight in the morning (Tr. 2395), because, first, they delivered the milk to the Arab and to them "as a custom to give to the poor" (Tr.

2390). It is unquestionable that neither the family of Santiago nor even Juliana could be labelled as "poor". The children of Antonio Santiago were the children of the overseer of Sabater, and Juliana, at least the niece of the natural daughter of don Manuel, Isabel González.

Witness Beltrán says that one Monday morning Juliana did not find milk, the witness went to the house of doña Ana to have breakfast and about half an hour later Julieta came in crying (Tr. 2364) and told the witness that she was going to see if doña Ana did her the favor to take her in because Cristina had beaten her (Tr. 2365). The witness states that she came up to doña Ana and told her that there was a little orphan girl from Sabater that had gone to see if doña Ana did her the favor of taking her in, doña Ana told her to take her up and then Juliana explained that her godmother had beaten her because she had not taken any milk and then doña Ana sent Julieta to have breakfast in the kitchen and sent for her godmother in Sabater (Tr. 2366).

The witness tells that Cristina Curet came and doña Ana asked her why she had beaten the girl and Cristina told her: "Doña Ana, because you do not know how bad this girl is and how grateful I am that you are taking her in", and then doña Ana asked Cristina if she wanted her to send her to the Orphans' Asylum and Cristina said yes "and then next day (doña Ana) *left* for Ponce with the three: Carmen Márquez and Adela Márquez and with Julieta" (Tr. 2369-2370). Now she says that doña Ana did not go with them, that only the chauffeur went with them (Tr. 2371). She states that don Manuel was not (in Puerto Rico?) and that the children were in the United States and that only the three of them (the three orphans) and the chauffeur went (Tr. 2371). From defendant heirs' own evidence it appears that don Manuel as well as his sons were in Puerto Rico

when Juliana left for the private school or the asylum (Tr. 3419).

As to the time elapsed between the middle of 1919, date in which Juliana Sanabria goes to the private school or asylum in Ponce, until October 16, 1944, date of the death of don Manuel, there are acts of acknowledgment which might be attributed together or separately to the predecessor of the defendant heirs, to his wife Ana María, or to his natural daughter Isabel González. To analyze this last period we have chosen that part of the evidence of the plaintiff which is less conflicting with that of the defendant heirs.

Plaintiff testifies that after she left the house of don Manuel in 1919 (Tr. 486), they took her to the Colegio Ángel de la Guarda in Ponce (Tr. 498). The conflict in the evidence on this point is to determine whether it was a private school or an asylum. The defendant heirs' own evidence shows that the person who sent a pupil to said school had to give a monthly amount to keep her there, apart from other gifts (Tr. 3499–3501). Plaintiff says that occasionally don Manuel went to the school (Tr. 504), a point which is corroborated by the witness of defendant heirs, Francisca Figueroa (Tr. 1943). Plaintiff says that doña Ana María paid for her (Tr. 509). She states that she stayed seven years in that school (Tr. 510). There is no conflict in the evidence as to the fact that plaintiff Juliana Sanabria studied in the Colegio del Ángel de la Guarda from 1919 until 1926. She says that she studied her first grade in that school, she learned how to embroider, mark and darn, with perfection, painting and drawing (Tr. 516). She states that she was sent to Havana in order that she should go into a convent (Tr. 517) and doña Ana gave her everything that the witness needed to go into the convent (Tr. 517).

Plaintiff continues testifying that several days before she sailed away she went to the house of don Manuel and he told the witness: "I have kept a souvenir for you . . .

I am going to give you this picture that nobody has, so that you may never forget in your life who your father is" (Tr. 521). This photograph is Exhibit 4 of the plaintiff. As we have seen, notwithstanding the efforts made by counsel for the defendant heirs to make Isabel González testify that Juliana might have taken that picture from Isabel herself or from any other relative of Isabel González, she merely answered: "perhaps she (Juliana) had a picture" (Tr. 1073).

Plaintiff states that don Manuel told her— "do not go, tell me the reason why you are going" —and the witness answered— "I cannot, I cannot say the reason, I do not want to bring discord in the marriage" —and then don Manuel embraced the witness and said good-bye to her (Tr. 521–522).

Plaintiff says that she sailed for Havana on March 27, 1926 (Tr. 524) and entered the convent on April 4, 1926 and stayed in the convent until the end of 1937, as a nun in the choir, which is composed of educated girls and from distinguished families (Tr. 532). She says that the nuns in the choir have their names changed and that she was named Sor María de San Raimundo (Tr. 535). She says that when she left the convent she went to the house of Conchita Rivera in Havana, a friend of the witness who had a girl studying in the same school and she stayed there until December 1937 (Tr. 549–550). She says that in January 1938, a nun from Asturias who knew don Manuel González, called Sor Serafina, sent for her and took her to the Colegio de María Inmaculada and left her there until Sister Serafina got a plane ticket to take her to Puerto Rico (Tr. 550), whereupon she returned to Puerto Rico on February 16, 1938 (Tr. 551).

Plaintiff further says that upon returning to Puerto Rico she went to live with her sister Isabel González, where she stayed for three years (Tr. 551). This fact is accepted as true by Isabel González, the witness of the defendant heirs.

Plaintiff continues testifying that don Manuel gave her everything she needed until the very moment of his death (Tr. 552), that is, until October 16, 1944. This assertion is corroborated by the testimony of Manuel Durán, witness for the defendant heirs, who testified that Juliana received fifty dollars monthly until the moment of don Manuel's death (Tr. 1911, 1922 and 1926). The plaintiff says that while Isabel and she were with don Manuel in the living room where they both lived, don Manuel told Isabel that he was going to give instructions to don Genaro Cautiño to send Isabel instead of fifty dollars, one hundred dollars, fifty for Isabel and fifty for the witness (Tr. 552–553). Don Genaro Cautiño was at that time manager of the firm Sucesores de José González (Tr. 1911). Mr. Durán further testifies that the payments made to Isabel and other payments subsequently made "although divided" were charged to don Manuel (Tr. 1924).

The version of Isabel González, witness of defendant heirs, is different. Isabel says that out of the hundred dollars she received, fifty dollars were assigned to Juliana to go to study to the United States. According to the testimony of Isabel González, this distribution was made at her own will, without any intervention from don Manuel. According to the documentary evidence, this division must have been made by instructions of don Manuel to Genaro Cautiño, as we shall see hereinafter, upon copying Exhibit 10. But in either way, it is an undisputed fact that since the year 1941, possibly since the month of September 1941, until October 16, 1944, date in which don Manuel dies, Juliana received fifty dollars monthly charged to the account of don Manuel (Tr. 1939) even after she stopped studying in the United States, which means that the version of Isabel in the sense that the money was for Julia to study is contradicted by defendant heirs' own evidence.

Plaintiff says that when she needed any additional money she went to estate Teresa and don Manuel gave her the money (Tr. 555–556). This part of the testimony of plaintiff is corroborated by the testimony of Audacio Marchi, witness for the defendant heirs, as we shall see hereinafter. He states that after the three years that witness lived with Isabel (1938–1941), the witness wished to go to the United States to take a course, she went to estate Teresa and don Manuel agreed and she relied on that don Manuel would give the order to give her the money she needed (Tr. 556). He says that when several days passed and the money did not arrive, the witness wrote to doña Ana (Tr. 556–557). This letter is Exhibit 54 and it reads thus:

Guayama, P. R.
July 25/41

My very dear doña Ana:

I write you this letter to send you my most sincere congratulations on your name day, and I shall ask the Lord for everything that you want most in this life.

Doña Ana, I am going to tell you something and that is that I want to study English in the United States, here I am wasting my time, I am a graduate of commerce and I only need three credits: English, Biology and History to graduate from the general course, which I cannot take because I am very poor in English, I cannot hold a conversation and there I would learn more in one year than here in three years. I beg you to *plead* for me and help me go, how happy it would make me if by September I would be studying there!

I have a very good friend that is married and she would charge me $35 monthly for boarding and besides, I would try to help myself on the side, I can even study day and night because there is that advantage there.

Doña Ana, I want you to write me and tell me if I can go and see you, because I want to talk to you personally; then I would write to a Cuban friend that lives in Loíza Aldea where I can stay two days in her house and go to see you; do not think that what you do for me will be lost, I assure you that it shall not be lost and especially you shall have earned it in the

Kingdom of the Heavens because whoever does charity shall be compensated by God.

I shall close now and I beg you to answer me *and do not be afraid because no one knows of my things because I have a post-office box and besides I do not account to any one of my doings.*

Well you know that I love you and with these lines I send you an embrace and I shall pray for you before the Holy Sacrament of Jesus.

(s) *Julita Sanabria*

(Documentary evidence, pp. 465–466.)

The witness says that doña Ana answered her from Central San Vicente (Tr. 557). The letter answering her is Exhibit 10 and it reads thus:

San Vicente, P. R.
August 14, 1941

Miss Julia Sanabria
Box 392
Guayama, P. R.

Dear Julia:

Although I have not written to you for a long time you know of my affection for you and I *have been speaking to Manuel* and I told him that of the money he sends your aunt, I think that it is advisable that he should *pass* half of it to you and *pay* for your ticket to the United States.

*"He offered me that he would do so* and I am very much surprised to learn from your letter that nothing has been decided. If nothing has not yet been done, please let me know and I shall see what I can do for you.

Without more, I remain affectionately yours,

(s) *Ana María H. de González*

Plaintiff witness further says that doña Ana spoke to don Manuel, but the witness went to the office of Cautiño and asked if any instructions had come from don Manuel and she was told no (Tr. 558) and it is then that she sends the following letter:

Guayama, P. R.

Mrs. doña Ana María:

I write to you to ask you a favor for the love of God, and it is that, having exhausted every means to accomplish my purpose to sail on this month in order to begin my school year in September in the United States, all aid has been denied to me, I intend to speak with don Genaro Cautiño and ask him to help me, promising him that as soon as I begin to work I shall pay him every month whatever I can, but before having this interview with Mr. Cautiño, I am writing to you to ask you to please lend me $250 so that I can get started, because my ideal is to study and work, but until one is settled one needs something to get started. I hope that you are not made out of stone, because a person as religious as you cannot be catalogued in such manner. I would like for you to answer me immediately. I am writing to you because it is not logical for a young lady to ask a gentleman for money, but since all aid has been denied to me, I shall have no other alternative. I do not ask you because I have any right, because I am not worthy that you throw your crumbs to a dog *because I have always known my place.* It would have been better for my mother and my father and myself to have had a stone tied to our necks and thrown into the sea instead of bringing children into the world to work and pains.

I shall bring this to an end and I shall ask your forgiveness if I have offended you. Again I beg you to write to me so that I may decide my problem soon.

I remain with love and at the same time grateful, and again I thank you.

(s) *Julita Sanabria*

(Exhibit 56—Documentary evidence, pp. 469–470.)

Plaintiff further testifies that she was given one hundred and fifty dollars for the trip and fifty dollars more, and the following month they sent her exactly the money that don Manuel had instructed that it be delivered to her (Tr. 559). She says that she immediately came to San Juan, bought her ticket and went to the United States where she stayed eight months, that is, from August or September, 1941, until April or May, 1942 (Tr. 560–561). She further states that in addition to the two hundred dollars, while she stayed in

the United States, she received fifty dollars monthly through Eusebio Vicente, whom she had authorized to get the money destined to her from the house of Cautiño (Tr. 562). This statement of plaintiff is corroborated by Manuel Durán, witness for the defendant heirs (Tr. 1916).

Plaintiff says that after she stayed eight months in the United States, she returned to Puerto Rico, stayed several days in Santurce, and then went to Salinas to see don Manuel (Tr. 567). She states that she saw don Manuel at the entrance of the base in Salinas and informed him that she had returned because there were rumors that New York was going to be bombarded (Tr. 568). She says that don Manuel made her a proposition to work in El Cometa in Ponce and that he would look for a place where she could board, but she answered that she preferred to stay in Santurce (Tr. 569) and then don Manuel told her that he went every Saturday to the Condado Hotel, from nine to ten o'clock in the morning, and that plaintiff could go and see him as often as she wished (Tr. 569). She says that during all the time that she lived in Santurce, while don Manuel was still alive, that is, from April or May, 1942 until October 1944, don Manuel gave plaintiff everything that the witness needed.

She says that the money sent to her from Guayama, was sent to her by money order by María Porrata, the telephone operator of Guayama, because don Eusebio, after she returned from New York, told her that he could not go and get the money for her (Tr. 571–572). This statement of the witness, in the sense that she continued to receive the fifty dollars until the very moment of don Manuel's death and that while she was in Santurce the money was sent to her by María Porrata, is corroborated by Manuel Durán, the witness of the defendant heirs (Tr. 1916). The plaintiff states that every time she needed additional money she went to don Manuel to the Condado Hotel and he always

gave it to her (Tr. 569–570), and besides doña Ana sent her money on different occasions (Tr. 573). This last statement of the witness as to the gifts of doña Ana María is corroborated by defendant heirs' own evidence (Tr. 3484).

The witness for the defendant heirs, Ana María Hernández widow of González, testifies that she remembers with complete certainty that she knew the plaintiff in the summer of 1919 (Tr. 3494). She says that during that summer the witness, her husband don Manuel, and their children of marriage were in Puerto Rico (Tr. 3494). She states that afterwards she sailed to the United States in August to take again her sons and she stayed there (Tr. 3494) until 1922 (Tr. 3419).

She testifies that when she began to pay for the girls (Carmen and Adela Márquez and the plaintiff Juliana Sanabria) "first it was 15 [fifteen dollars] for those three girls, later it was increased to twenty with Carmen Maneiro . . . and from 22 [1922] or 23 [1923] it was then fixed at $25 monthly" (Tr. 3499). She says they did not pay for each orphan, but that they paid for all them together (Tr. 3499–3500). She says that "in the asylum they never gave her a receipt, because I could not ask the sisters to give me a receipt. I gave them 80, 100 dollars" (Tr. 3500), "I sent them shoes, I sent them dresses . . . what they needed" (Tr. 3501). She says that she gave for the three and for others who were not hers (Tr. 3502).

She states that in 1924 they began to tell the witness that the plaintiff had vocation to become a nun (Tr. 3496). She says that she spoke to Juliana and told her that she thought that she did not have vocation, and also told her: "I shall pay for your ticket to return because you do not have vocation" (Tr. 3497). She says that she told Sister Lucía to send the plaintiff to a convent after she was twenty-one years old, that is, after March 8, 1926, because the plaintiff did not have vocation to be a nun and should be conscious

of what she was doing (Tr. 3506); that she should be twenty-one years old "like Encarnación and also like my cousin Pilar. Her parents objected. They should be 21 and know what they are doing" (Tr. 3506). The witness says that she herself looked for a convent in Spain in 1924 and in 1925 for the plaintiff, but plaintiff was not accepted (Tr. 3511). She says that in 1926 Sister Lucía told the witness that there was a convent where they would take her (in Cuba) (Tr. 3511).

Mrs. Hernández widow of González continues her testimony and states that it was don Manuel who signed the check for one thousand dollars for the dowry of Juliana for the convent because the witness could not sign checks (Tr. 3481). She says that her separate property yielded rents, but she could not sign checks because her signature was not authorized in the bank (Tr. 3532) and describes her separate property as ten shares of Coamo Springs (Tr. 3533). She says that don Manuel, apart from signing the check, had no other participation in the matter (Tr. 3527). She states that she had given to don Manuel a power of attorney "very ample and it seems that perhaps he thought that I was a little spendthrift. So I gave him all my rents and that is why I appealed to him, because this girl asked me for a dowry and since it was a little more than I could afford, rather for that reason I asked him to make out the check and to charge it to me" (Tr. 3480). She says that in the year 1938 she had to pay for plaintiff's return ticket (from Cuba to Puerto Rico) (Tr. 3497 in fine) and she did it because Sister Lucía informed her that Sister Serafina had paid for plaintiff's ticket (Tr. 3498).

Witness further states that when she received the letter from Juliana informing her that she wanted to go to New York, "then I asked my husband to please talk with her aunt (Isabel González) and ask her that of the money that Manuel gave her to help her niece (the plaintiff) as a charity in

order that the latter could study, that she too was charity work because I was already tired of everything I had done for her, that it was fair that the aunt (Isabel) should give her something, I would pay the ticket, if necessary" (Tr. 3225). According to the documentary evidence, it was don Manuel, and not doña Ana María, who had to pay for the ticket (Exhibit 10). The witness states that she spoke to Mr. Cautiño to give her the ticket and to give her something if her aunt helped her so that she could go away (Tr. 3528).

The witness says that after she sent the plaintiff to the Orphans' Asylum, the witness kept correspondence with the plaintiff, letters in which plaintiff sought her aid, money, and that she answered them and "whenever she could she pleased her" (Tr. 3214). She says that plaintiff wrote to her from New York asking her for some money to get married and she sent her the help she requested (Tr. 3484).

■■ We have reached the moment to make the final analysis that would lead to the solution of the different conflicts in the evidence and to the formalization of the new findings of fact, applying the rule of the preponderance of the evidence.

1. As to the evidence of the concubinage relations between don Manuel and Isilé Sanabria, the trial judge did not give credit to the testimony of Francisco Romero, plaintiff's witness, because he considered it impossible, contradictory and exaggerated. In that sense, the trial judge expressed himself in the following terms: "We must remember that Francisco Romero testified that from 1900 to 1901 he was a buyer in Manuel González' house, that is, they gave him a note, sent him to a store, he picked the groceries and delivered the note. But the evidence showed that this could not be true, since at that time he was a 7-year old child. From the way Francisco Romero testified, his hesitations in the witness stand, his exaggerated and unbelievable statements, and his contradictions as to whether Desilé was older

than Isabel or Isabel older than Desilé, this Court was compelled to give no credence to his testimony. On the other hand, the testimonies of Isabel González, Dolores Briganti, and Alejandro Ramos Cartagena, corroborated by the documentary evidence introduced by defendants, deserve the absolute credence of this Court. . . . Francisco Romero, who presumed to be acquainted with the facts concerning plaintiff's birth and subsequent facts until the death of plaintiff's mother on October 22, 1912, stated that he did not see plaintiff's mother living with Alejandro Ramos Cartagena, did not know whether she had a child by him, and did not see her living with Gaspar Carrillo, notwithstanding that all the evidence proved these facts. It further appeared that insofar as Olympia Sanabria is concerned, it was Gaspar Carrillo himself who informed the death of that child. . . ." (Judgment Roll, pages 98 to 99.)

It seems that the objections of the trial judge to the testimony of Francisco Romero are directed more to the veracity of his testimony than to the fact of his presence in the house of don Manuel during the years covered by his testimony. It is a fact spontaneously revealed by the evidence that, after San Ciriaco, the lower part of don Manuel's house and the tenements further down from don Manuel's house served as a refuge for certain families who had suffered losses. Francisco Romero is the son of Vicente Romero, one of the trusted men of don Manuel (Tr. 78). We must not forget that the institution of the "child taken in" or of the "child in charge" is too common in our rural sociology to constitute an exceptional case. In this same case there appear other children taken in by the González family—Carmen and Adela Márquez, Carmen Maneiro, Julia Beltrán, for example. On the other hand, child labor is a reality that surrounds us on every side. We do not understand how the trial judge could be surprised at the kind of work performed by Francisco Romero when confronted with

the simple task entrusted to Francisco Romero in the house of don Manuel: "it was just a question of giving me a note and they sent me to the store and I took and gave the note" (Tr. 51); "then what I was doing was that I was a messenger and planted plants and watered a small garden in the house" (Tr. 62–63). Francisco Romero was not a buyer, properly speaking, but a mere messenger boy.

As to the contradictions of witness Romero with respect as to whether Isilé was older than Isabel, what witness Romero testified, in good legal hermeneutics, was by observation: "What I can explain to you is that Isilé was taller and older than the other" (Tr. 61); "I figure that she was about fourteen years old" (Tr. 61); "To my belief I thought that she was older" (Tr. 84). As we have seen, in 1900, Isilé, who was born in 1887, was thirteen years of age, that is, one year younger than what witness Romero figured from observation. Subsequently, on this same matter, Isabel González testified that for these years—1899 to 1903—her natural sister Isilé Sanabria was "a grown-up lady" (Tr. 1171). Isabel González herself, when asked how old her sister Isilé was, could not give the age that her sister might have had at that time (Tr. 1015).

Contrary to the conclusion of the trial judge, the testimony of Francisco Romero as to the other children of Isilé Sanabria is entirely crystal clear. Witness Romero arrived at the house of don Manuel, for the first time, in the year 1900 and stayed until 1901 (Tr. 50); in 1902 he left and stayed that year and in 1903 in Sabana Hoyos in a farm of his father (Tr. 52); in 1904 he returned and lived in the house of don Manuel until 1908 (Tr. 52–53) and in 1908 he went to Fortuna de Gual (Tr. 53) and until 1912 when he quit working for don Manuel and moved to Barritos (Tr. 48–53). He says that when he returned to the house of don Manuel in 1904, it was rumored that Isilé had had a child: "That was a rumor, but I did not see it for sure.

What one does not see one should not repeat" (Tr. 63). Undoubtedly, he refers to the first child of Isilé, Luis Sanabria, born in September 1903 and who died in December 1903, according to defendant heirs' own evidence.

Witness Romero keeps on saying that at the end of 1904, September to December 1904, Isilé left the house of don Manuel González to go to the house of her uncle, Severo Sanabria (Tr. 37) and that "four or five months after she arrived there she gave birth to a girl" (Tr. 38). Undoubtedly, he refers to the second child of Isilé, Juliana Sanabria, plaintiff herein, born on March 8, 1905. He says that he does not know the son of Alejandro Ramos Cartagena because he never saw him (Tr. 68). Undoubtedly he refers to Nemesio, whose birth date is not revealed by the evidence. Nor did witness Dolores Briganti see him (Tr. 1643). The stipulation of the parties in the sense "that if there was any sexual intercourse between the witness (Alejandro Ramos Cartagena) . . . and Desilé Sanabria, . . . it was at the end of 1907 and part of 1908" (Tr. 1838–1839) refers, although vaguely, to this son Nemesio. The evidence on the existence of this son is not as sufficient as the evidence of the other children. The stipulation of the parties itself on the sexual relations of Isilé and Alejandro Ramos Cartagena is quite wary.

Witness Romero had testified that in 1908, he left the house of don Manuel González to go to Fortuna de Gual (Tr. 53). Defendants' own evidence establishes that in Fortuna de Gual lived Vicente Romero, father of witness Romero, and Pascuala Romero, aunt of witness Romero and wife of Higinio Pérez (Tr. 1519–1520). Dolores Briganti, witness for the defendant heirs, herself testifies, at a moment when her testimony seems to be more spontaneous, that Higinio Pérez always lived in Fortuna de Gual (Tr. 1566–1589). The son of Isilé and Alejandro Ramos Cartagena must have been born at the end of 1908 or at the beginning of 1909,

as we shall see hereinafter, during which both dates Francisco Romero was living far from Los Riegos.

Witness Romero further states that neither did he learn of the love affair between Isilé and Gaspar Carrillo. The witness had testified that in 1912 he left the estate of don Manuel: "I left and until now" (Tr. 53). The fourth and last daughter of Isilé Sanabria, Olympia Sanabria, was born on April 1, 1912, in the La Lapa ward of Salinas and died on February 24, 1915 in the Aguirre ward of Salinas, in which both dates witness Romero had already left the property of don Manuel. Isilé Sanabria also died on October 22, 1912 in the Aguirre ward in Salinas, in the same year her daughter Olympia was born. This leaves a reasonable margin of time and space in the knowledge of witness Romero, in favor of his credibility. There is nothing in the evidence of the defendant heirs to show in any way prejudice, interest or moral condition that may affect the credibility of Francisco Romero.

Can a seven-year old child remember what witness Romero narrates as to the first love affair of don Manuel and Isilé—when he (don Manuel) "entered her room, lay in bed and played . . . and afterwards closed the door, pulled it"? (Tr. 32–33.) If Romero had witnessed these amorous relations only once, perhaps one could doubt of the power of retention of a child witness. But he sees that "many times" (Tr. 36) during the years 1900 and 1901, that is, at the age of seven and eight, and sees them again in 1904 when he is already eleven years old, and continues observing the acts of acknowledgment of don Manuel towards Isilé and towards the plaintiff until 1908 when he is then fifteen years of age. In any event, the period of observation which is actually of significance to make a finding as to the love affair at the time of plaintiff's conception—May to June 1904—is the second, when witness Romero is already eleven years old.

The testimony of Isabel González and Dolores Briganti which led the trial judge to give them "the most absolute credit" are two testimonies seriously objectable. Isabel González was set on one date—June 1903—as the date in which her father don Manuel sailed away, the preparations in the house started for the wedding that was to be held one year and two months later—September 3, 1904—and she and her sister Isilé left the house of don Manuel (Tr. 1104, 1177). When asked if at the time both left the house of don Manuel in June 1903, she noticed whether her sister Isilé was pregnant—at that time Isilé was six months pregnant—she answered that she did not notice (Tr. 1140) and, on the contrary, accuses her sister of having gone to live, two months and fifteen days later, with Higinio Pérez (Tr. 1001) at the precise moment when Isilé is giving birth to her first son Luis, conceived in November or December 1902. She says that after that she did not see her sister Isilé again (Tr. 1001).

She says she heard her father don Manuel tell plaintiff Juliana Sanabria that he was not plaintiff's father, that plaintiff's father was a horse trainer, Higinio Pérez, and when she is confronted with an assertion in her own handwriting in which she recognizes Juliana as her sister—the autograph in the picture that Isabel sends Juliana to the convent in Cuba—she attempts to elude her duty as witness by giving ambiguous answers and refuses to give a caligraphic sample of the characteristics of her handwriting in order to make the proper comparison.

Notwithstanding any juridical subtlety, the remittance by Isabel of her own picture to the plaintiff, thus autographed, using the possessive pronoun *"my"*, that logistic term, sufficient in itself, *"my sister"*, compels us to conclude that Isabel González, prior to the alleged conversation between her father and plaintiff Juliana Sanabria, which she narrates, knew that plaintiff Juliana Sanabria was not the

daughter of Higinio Pérez but of don Manuel, and therefore, her sister on her father's side.

This explains many aspects of the conduct of Isabel which otherwise would result quite illogical: for example, the repudiation *ab irato* of her sister Isilé on her mother's side, when she learned of the love affair, and her acceptance *in camera caritatis* of her sister on her father's side, Juliana, not only when she was a child and lived in the house of María Curet, but also after Juliana flouted the plan of becoming a nun. The version that she took plaintiff in her house because she could not leave her destitute, does not convince us. When Juliana goes to live with Isabel in 1938, she is not an adolescent of fourteen years old, abandoned (Tr. 1452) as she was when doña Ana María "took charge of her" (Tr. 1452), nor an orphan, for Higinio Pérez dies in 1946 (Exhibit 5), but a woman of about thirty-three years of age (Tr. 1329), with nineteen years of religious education.

The testimony of Dolores Briganti is the typical case of the testimony that should not be believed. As to such a simple fact as when and where she went to live during the years when Isilé Sanabria conceived her first two children, her testimony wavers continually between contradiction and manipulation. If we were to give credit to witness Briganti as to the "role of lovers" (kissing and embracing) that she observed between Isilé and Higinio Pérez, about February 1903, at that time, Isilé would be pregnant three or four months by another man, for her son Luis must have been conceived between November and December 1902. Undoubtedly it was this that induced the witness to testify that in the latter part of the month of December 1903 (Tr. 1547), during the Christmas holidays, she saw alive a boy, five days old (Tr. 1547), who had actually died at the age of three months, on December 14, 1903.

If we were to give credit to witness Briganti as to the passing of Isilé in front of the house of the witness, carrying a bundle of clothes, accompanied by Higinio Pérez, on or about the month of October 1904, at that time Isilé would be pregnant four or five months by another man, for her daughter Juliana must have been conceived between May and June 1904. The times she says she saw Higinio Pérez in Los Riegos "everyday there" must have been after September 1904, on which date the witness begins to do the washing of doña Ana's "clothes" in Los Riegos.

Now then, can it be reasonably concluded that Higinio Pérez, a simple worker in the farms of don Manuel González, had sufficient pre-eminence—with the background of interest and love presented in this case—to have a love affair with a sister of a natural daughter of don Manuel, both being raised by the latter, almost in the very home of don Manuel, and take her out from there five months pregnant; compel her uncle, who is also an uncle of don Manuel's own daughter, who repudiates the conduct of her sister, to permit him to carry on this love affair in the house of the uncle, who lived with his wife in said house, according to witness Briganti, and with his niece Isabel González, daughter of don Manuel, according to witness González; take her from there, again pregnant, force her brother, who is also the brother of don Manuel's daughter, taken in by the latter in his house together with his two sisters, to permit him to have a love affair in her brother's house, who also lived with his wife in said house (Tr. 1526), according to witness Briganti, all with the tolerance of Isabel González, of Severo Sanabria, of Paco Sanabria and even of don Manuel himself? This would be the illogical result of Dolores Briganti's testimony. Never a thought that the love affair between Isilé and Higinio Pérez, because it was clandestine, escaped the observation of the González family or of the Sanabria family, for according to witness Briganti's own words, while Isilé was in

the house of don Manuel "her abdomen was noticeable" (Tr. 1543).

In any event, the version of the love affair of Isilé is better formalized within the time and space given in the testimony of Francisco Romero than in the testimony of Dolores Briganti, and it is our duty to give credit to the fact directly observed for a longer period of time and not to a mere conjecture as to an incomplete fact, episodically observed. Judicial credit is not a superrational intuition, nor an act of faith, but a critical examination. This being so, it is our obligation, as triers, to give credit to the testimony of Francisco Romero and deny it to the testimony of Isabel González and of Dolores Briganti, and any conclusion to the contrary is clearly erroneous.

As to the time covering the first years of childhood of Juliana Sanabria, that is, from March 8, 1905—date of birth of Juliana—until October 22, 1912—date of the death of Juliana's mother, Isilé Sanabria—upon comparing the four testimonies of Francisco Romero and plaintiff Juliana Sanabria, on one side, and of Dolores Briganti and doña Ana María Hernández, on the other side, there arises the undisputed fact that in the small house next to the gate of Coquí there lived Severo Sanabria with his wife Juana Vázquez, where they aver, Francisco Romero as well as plaintiff, that Isilé Sanabria lived with her daughter Juliana. As to the testimony of Ana María—apart from her frequent trips to Spain and the United States—the most probable thing is that no one passed through the gate of Coquí in the first years of their marriage, which are incidentally the years in which the entrance to the farm where the house of don Manuel and his wife was situated was through Coquí. If she had passed by there occasionally, the conflict of the evidence would be limited to the statement of doña Ana that she does not remember having seen any adult person or

child living in the house of Severo, outside of Severo and his wife Juana Vázquez.

As to the testimony of Dolores Briganti, she states that Isilé originally lived in the house of Severo "quite some time" (Tr. 1449) which she later reduces to seven months after her boy Luis died (Tr. 1561). We have already seen that this must have been until October 1904. If credit were given to the part of her testimony which says that she saw Isilé living in the house of her brother Paco Sanabria, until two years and some months after Juliana was born, her testimony, as to that point, would only cover until April, May, June or July, 1907.

The statement of witness Briganti, in the sense that after 1907 Isilé and her daughter Juliana went to live in the house of Gaspar Carrillo, cannot be upheld, in view of the stipulated fact that at the end of 1907 or at the beginning of 1907, Isilé indulged in a love affair with Alejandro Ramos Cartagena, presumably in the house of Paco Sanabria, who was married with a sister of Alejandro Ramos Cartagena, called Fela Cartagena (Tr. 1827), and of those relations a boy was born called Nemesio, whose birth date is unknown, but which is most probably at the end of 1908 or at the beginning of 1909. If this is so, as a matter of direct challenge, the adverse evidence does not establish the place where Juliana lives from 1907 to 1911, this latter date being the only possible date when the love affair between Isilé and Gaspar Carrillo began, counted from the conception of their only daughter Olympia Sanabria, which must have been conceived between June and July 1911. Juliana might have lived in the small house next to the gate of Coquí, alone or in company of her mother, or in the house of Paco Sanabria, several weeks, as established by plaintiff's evidence. According to the testimony of witness Briganti, the only man that set up a house for Isilé Sanabria was Gaspar Carrillo. This was what forced witness Briganti to throw Isilé into the

arms of Gaspar Carrillo in 1907, when the love affair between Isilé and Alejandro Ramos Cartagena had not yet begun, nor their son Nemesio had been born.

The evidence of the defendant heirs rests on the fact that Isilé lived in the house of her brother Paco until 1907 and from 1907 in the house of Gaspar Carrillo, to show, that any support or maintenance needed by Isilé as well as by her daughter Juliana, must be furnished by her brother Paco or her paramour Gaspar. This deduction is weaker than the direct statement of Francisco Romero that it was don Manuel who furnished plaintiff Juliana Sanabria with her necessities for living, particularly from and after 1907, when according to Dolores Briganti's own testimony, she did not see the girl again in the house of Paco.

As to the time elapsed from October 22, 1912—date of the death of Juliana's mother—until June, July or August, 1919—date in which doña Ana María takes plaintiff in—there are two conflicts in the evidence which must be solved: (1) where did Juliana live between 1914 and 1916 and (2) who supported her.

As to the first one, plaintiff's evidence shows that after Juliana left Hoyo Inglés she goes to live at Húcares in the house of Juan Colón, where she stays until June or July, 1916 and defendant heirs' evidence tends to show that after Juliana leaves Hoyo Inglés she goes to live at Sabater in the "airplane." As to the second period, the evidence of the plaintiff states that the person who supports Cristina as well as plaintiff Juliana Sanabria, is don Manuel González and the evidence for the defendant heirs that Cristina as well as plaintiff Juliana Sanabria, is don Manuel González and the evidence for the defendant heirs that Cristina as well as Juliana lived on the profits of the dining place that Cristina had.

There is no doubt that Juliana lives in Hoyo Inglés from the end of 1912 or beginning of 1913 until some time prior to May 14, 1914, in which date María Curet gets married.

Plaintiff testifies that from Hoyo Inglés she went to live to Húcares, in the house of Juan Colón. This statement is corroborated by the testimony of Juana Velázquez, Eladio Acosta and Pedro Cruz.

The evidence for the defendant heirs forks out into two periods during which Cristina Curet lives in the "airplane" in Sabater. The first one places Cristina Curet in the airplane in Sabater between the years 1910 and 1913. Doña Ana María Hernández widow of González, witness for the defendant heirs, testifies that Cristina was her cook until 1910 (Tr. 3452) and that "then we (she and don Manuel) gave her (Tr. 3452–3453) a room in the 'airplane' to keep her near in case my cook left I could send for her" (Tr. 3452). She says that after they gave her that room she returned to the house of the witness, "one day that we did not have a cook she came and helped me" (Tr. 3453). Sabad Reyes, witness for the defendant heirs, testifies that he knew Cristina in Sabater in 1913 because he went to lunch at a dining place that Cristina kept in Sabater at that time. According to the testimony of María Curet, witness for defendant heirs, this first dining place of Cristina in Sabater "was closed down" about the latter months of 1913 or the first months of 1914, when Cristina goes to the house of the witness Curet for two or three months to rest. It is unquestionable that during the first period, 1910–1914, Juliana does not live with Cristina in Sabater.

The second period places Cristina Curet, together with Juliana, in the "airplane" in Sabater from the end of 1914 until June or July 1916. Witness María Curet says that Cristina and Juliana left the house of the witness in Hoyo Inglés before May 14, 1914 to go to the tenement the "airplane" in Sabater. But the testimony of Antonio Santiago, father, and Antonio Santiago, son, both witnesses for the heirs, contradict her because they say that it was not until the end of 1914 that the "airplane" was finished and al-

though Cristina asked for a room in the "airplane" at the beginning of the year, it was not until the end of 1914 that she obtained a room in the "airplane". There is at least a gap in the evidence of the defendant heirs, from May to December 1914, that does not explain where Cristina and Juliana lived.

Witness María Curet testifies that after Cristina left Hoyo Inglés she visited an aunt of hers in Sabater from 1915 to 1916, during which years she visited more often because she was already married and visited her aunt with her husband (Tr. 1758). This, to a certain degree, corroborates the version to the contrary which establishes that Cristina and Juliana left Húcares to go to Sabater in June or July 1916. It seems that at other times when María Curet visited Cristina it was prior to 1914.

From the examination we have previously made of the three testimonies of the Santiago family, it is unquestionable that they know nothing of the life of Cristina and of Juliana prior to July 1916, on which date they go to live to Sabater. After 1914 and prior to 1916 there only remains the statement of María Curet that she discovered the loss of the dining place of her aunt between the years 1915 and 1916 which were the years during which she visited her aunt more often. Applying the rule of the preponderance of the evidence, we must conclude that during this second period 1914–1916, Cristina and Juliana did not live in Sabater, but in Húcares.

Plaintiff's evidence establishes the fact that everything that Juliana needed was given by don Manuel to Cristina so that the latter would keep her and during the years from 1914 to 1916, when they lived in Húcares, Cristina had no business and did nothing else than take care of the plaintiff, and both (Cristina and Juliana) lived on what don Manuel gave them. The evidence of the defendant heirs

says that Cristina and Juliana lived on the earnings of a dining place that Cristina had.

It is advisable to specify what kind of business was carried on by Cristina in the "airplane" in Sabater. Doña Ana María Hernández testifies that Cristina lived on the profits of a dining place that "was not actually a dining place. She prepared meals and served them to the laborers" (Tr. 3454) and that Cristina "whenever she was in need of something she went and asked me for it and if she did not have a dress she asked me for it" (Tr. 3453) or if she had no dresses or shoes she went to her house (doña Ana María's) "to complete whatever she needed" (Tr. 3453). Previously she had testified that Cristina "always had different bottles of *mavi* which she sold and had her fritters and things there" (Tr. 3422). This testimony undoubtedly refers to the first period of the dining place from 1910 to 1913. The second description of the business of Cristina is made by María Curet, witness for the defendant heirs. She says that the business of Cristina was a "lousy" thing and that Cristina "was losing very much" (Tr. 1783). This testimony undoubtedly refers to some period of time between 1914 and 1916.

The third description of the business of Cristina is offered by plaintiff herself. She says that Cristina "on Saturdays, pay day, made coconut candies, codfish fritters and took that opportunity to sell them there and have her benefit" (Tr. 481). This statement undoubtedly refers to the period of time between 1916 and 1919.

The fourth description of Cristina's business is given by Ángel Ramón Zayas, plaintiff's witness. He says that Cristina "at times fried codfish and gave lunch and supper to two or three persons" (Tr. 156). This statement undoubtedly refers to the period of the business from 1916 to 1919.

The fifth description of Cristina's business is given by Antonio Santiago, son, witness for defendant heirs. He says

that "the old woman Cristina Curet had a *small business* there because she lived very poorly. She made coconut candy and gave meals to some workers there, and made lollipops which she sold for two or three cents" (Tr. 2252). This statement undoubtedly refers to the period of business from 1916 to 1919. It is to this same period that Miguel Santiago, witness for the defendant heirs, refers upon offering the sixth description of Cristina's business. He says that Cristina "lived from the business, selling bread, candies and giving meals outside" (Tr. 2333).

The only witness who speaks of profits from the dining place of Cristina is María Curet, witness for the defendant heirs. As it will be remembered, María Curet testified that when her aunt went to Guayama to recover for two or three months in 1914, the dining place had been closed down because she did not have anyone to help her, and then the witness recommended to her aunt to bring plaintiff with her because since she had finished the first grade, she was able to help her. It seems that the fact of having brought Juliana with her did not help Cristina, because when María Curet, already married, goes to visit her aunt from 1915 to 1916, she discovers "that the workers charged less than what they took" and that "Cristina was losing very much". So that we cannot conclude that Cristina's dining place was a source of income from which the latter and Juliana could live with the ease that according to María Curet's own testimony, Cristina kept Juliana when the latter lived in the witness' house in Hoyo Inglés.

A strict analysis of the testimonies referring to this period—1912 to 1916—compels us to conclude that when Cristina left Hoyo Inglés together with Juliana in Guayama, she did not go to live to the "airplane" in Sabater, but to the house of Juan Colón in Húcares, where they lived from 1914 to 1916, and that during that period Cristina has no dining-place business, nor is engaged in any other thing

except taking care of the plaintiff by instructions of don Manuel.

As to the period from 1916 to 1919, defendants' own evidence shows that don Manuel González performs certain acts of protection towards both women, which is more in harmony with the version of plaintiff's evidence than with the complete incommunication between don Manuel and his natural daughter, which the evidence for the defendant heirs seeks to establish. It is Antonio Santiago, father, the own witness for the defendant heirs, who testifies that don Manuel agreed to give lodging to Cristina and Juliana in the tenement known as the "airplane". It is the own witness of the defendant heirs, Antonio Santiago, son, who testifies that at the time that Juliana was in Sabater, don Manuel was approached to give some milk to Juliana and don Manuel agreed, which statement corroborates the testimony of Juana Velázquez, in the sense that while Juliana lived in Húcares she had a cow for her milk. Doña Ana herself testifies that while Cristina lived in the "airplane", she used to help Cristina with dresses and shoes.

Plaintiff's evidence to the effect that while Juliana lived in Sabater she enjoyed the protection and care of her father, is buttressed by the testimony of a witness worthy of entire credit, Ángel Ramón Zayas. Although there is a weak attempt in the evidence of the defendant heirs to imply a possible hostility between don Manuel and witness Zayas, such version is ridiculous. Defendant heirs' own evidence shows that shortly after Zayas was working as clerk in Sabater (1916) (Tr. 157), he is promoted to overseer of estate Fortuna (Tr. 2259), where he works until 1922. There is subsequent evidence to show that Zayas returns to work with the defendant heirs at the request of don Ramón González (Tr. 179).

The explanation given by witness Beltrán as to the manner in which Juliana reached the house of doña Ana María

is frankly unbelievable. Defendant heirs' own evidence shows that Juliana went every morning with the children of Antonio Santiago to get milk. If that morning Juliana went to Cristina without milk, the latter had the opportunity to verify Juliana's assertion in the sense that the milk had not been sufficient to distribute among the poor, by asking the children of Antonio Santiago, who must have also returned to Sabater without milk. The explanation given by doña Ana María as to how Juliana came to her house and the time she stayed with her, is frankly trivial. Defendants' own evidence shows that the other girls who went to the school or asylum together with Juliana were in the house of don Manuel for quite sometime. Unless there was a very special reason to remove Juliana from the house of don Manuel as soon as she arrived, such conduct would not be normal within the human relations observed about other persons. Perhaps the reason was that doña Ana María knew that Juliana Sanabria was the daughter of don Manuel.

The attempt to compare Juliana with the Márquez sisters and with Carmen Maneiro is also suspicious. Carmen and Adela Márquez were the daughters of a woman who did the ironing in the house of don Manuel (Tr. 3422) and Carmen Maneiro was the niece of a maid that doña Ana María had for a long time (Tr. 3426). Juliana Sanabria was, at least, the niece of a natural daughter of don Manuel González. In school the Márquez sisters and Carmen Maneiro were taught domestic work and needlework, how to clean, sweep, cook, wash dishes, and wash and iron (Tr. 2058). Juliana Sanabria went through grammar school and learned how to embroider, mark, darn with perfection, also painting and drawing (Tr. 516). Carmen Márquez left school to work as a maid in the house of doña Sara Morales (Tr. 1970); Carmen Maneiro left school to work as a maid in the house of doña Ana María (Tr. 2084). When she testified on September 9, 1948, Carmen Maneiro was still a

servant in the house of doña Ana María (Tr. 2045). Juliana Sanabria left school and became a member of the choir in a convent in Cuba, and the evidence shows that the sisters in the choir were ladies with education from distinguished families (Tr. 532).

If the case should reach the year 1919 and nothing more; perhaps it could be accepted that the acts of acknowledgment of the father were subject to the balance of possibilities on which judicial credit might rest, *a grosso modo*, in some extreme case. But the fact is that from August or September 1919 until October 16, 1944, date on which don Manuel dies, the plaintiff enjoys the attention and care on the part of the González spouses, which does not belittle at all the petty attentions which plaintiff enjoyed during her childhood and adolescence. Comparing the protection that Juliana Sanabria receives with the protection that Isabel González receives, as acknowledged natural daughter of don Manuel, according to the evidence of defendant heirs, there are times in which the protection in both is the same.

As a legal question it is not possible either to establish the sharp division made by the trial judge between the acts of the wife or the natural daughter of don Manuel and the acts of the husband or father, attributing to them a different consequence from the effects of acknowledgment. There is only one common property between husband and wife, a single controlling will, a familiar unit which cannot be disposed of by means of niceties. Between father and daughter there is a prolongation of the personality, a complex of interests and affection and a sense of interdependence which is difficult to evade. When the filiation statutes make a distinction between acts of acknowledgment of the presumptive father and their family—as in the case of § 135 of the Spanish Civil Code, source of our own law—they do so between the presumptive father and the former family of the latter (grandparents, uncles and aunts, brothers and

sisters or nephews and nieces) but not as to the family which is created by the presumptive father (spouse or children): See 3 Scaevola—*Código Civil*, 391 *et seq.*, 396; 5 Castán —*Derecho Civil Español* 74, Vol. II; 106 *Revista General de Legislación y Jurisprudencia*, 25, 30 (1905). In any event, there are times in this case when the wife has no other alternative than to resort to her husband, the presumptive natural father, in order to solve some of the problems of the plaintiff.

The analysis of the evidence connected with this period, 1919–1944, shows that Juliana Sanabria received direct help from the González family, either through the wife, doña Ana María, or through don Manuel himself, because it is don Manuel who sees that both sisters should distribute between themselves the one hundred dollars previously assigned to Isabel González, the natural daughter of don Manuel. We have no doubt either that it is don Manuel who gave the money for the dowry to Juliana to go to the convent, as he did in the case of Pilar and Encarnación, two relatives of the González spouses. The reason that the check of the dowry is signed by don Manuel because his wife did not have an authorized signature in the bank does not convince us. Plaintiff's counsel calls our attention to Exhibit 23 of the defendant heirs (transcript of documents, at p. 75) in which doña Ana María appears with an open account in the Crédito y Ahorro Ponceño in the city of Ponce on January 3, 1927. Furthermore, when don Manuel intervenes to ask Isabel González to give to her "niece" Juliana—niece on the side of the mother, although sister on the side of the father—half of the pension that don Manuel passed to his natural daughter Isabel González, don Manuel knew that Juliana sought to be recognized as his daughter, if we are to give credit to the testimony of defendant heirs' own witness, Isabel González.

Plaintiff's Exhibit 10, a letter from doña Ana María dated August 14, 1941 to the plaintiff, is clear in the sense that the person who might have paid for plaintiff's ticket to New York could be don Manuel himself and not doña Ana María: "will pay your ticket to New York," says the letter textually.

The interpretation made by the trial judge of plaintiff's last letter to doña Ana María—Exhibit 56, transcript of documents 469–470—is not responsive of a sound and analytical method. The documents are historical proofs of some vital facts in strict conformity among themselves. Let us see: the first letter written by plaintiff Juliana Sanabria to doña Ana María on July 25, *1941*—Exhibit 54, transcript of documents 465–466—asking for help to go to study to the United States has several key phrases which merit special attention. The letter has an eloquent salutation: "My very dear doña Ana"; a very significant plea: "I beg you *to plead* for me and help me go" and a certainty which is responsive of a very definite psychological process: "I beg you to answer me and *do not be afraid because no one knows of my things*, because I have a post-office box and besides I do not account to anyone of my doings."

The answer of doña Ana María to the plaintiff—Exhibit 10, transcript of documents, p. 29—explaining the steps that the former has taken in favor of the latter, also contains certain key words which merit emphasis. The salutation is also eloquent: "Dear Julia"; a categorical answer: "I have been speaking to Manuel and I told him that of the money he sends your aunt, I think that it is advisable that he should pass half of it to you and pay for your ticket to United States"; and a most valuable information: "He offered me that he would do so and I am very much surprised to learn from your letter that nothing has been decided. If nothing has not yet been done please let me know and I shall see what I can do for you".

Then comes the episode of estate Teresa which is described by Audacio Marchi, defendant heirs' own witness: on one occasion he saw the plaintiff Juliana Sanabria approach don Manuel and speak to him: "that was while I stayed in estate Teresa, making a round with don Manuel, in one of the rounds he was in the house of estate Teresa, a house located on the seashore, taking fresh air there. After making the round, and at times, at four or five o'clock he sat on the porch to take fresh air, and I stopped there; the house has two stories . . . Then I was there, the car was parked to the side of the house, and I went to the door, to speak with the people there while don Manuel took fresh air or drank coconut water, or whatever it was, and a public-service car arrived from Guayama. This lady (the plaintiff) alighted from the car and went towards the house and don Manuel was already half asleep in the porch of the house, sitting in a rocking chair. And I noticed this from where I was, he made gestures while talking, since I was at a distance, he stood up . . . Don Manuel stood up, came and took the automobile, 'let us go' he ordered that we leave together . . . She (the plaintiff) tried to get in the car but he (don Manuel) ordered me to leave. He did it angrily, as if he were mad and I followed him". (Tr. 2625–2626.) That don Manuel said: "Let us go, let us go, I cannot stay here" (Tr. 2626); that refreshing his memory as to what don Manuel said it was: "Let us go that I am fed up with this thing" (Tr. 2626); that the car in which the lady arrived had left (Tr. 2627); that don Manuel was going to make a round of the estate Teresa and after he was tired of making the rounds, very often "he went up to his country house, a house where he had receptions, by the seashore, with a terrace, he took out a rocking chair and sat there to take fresh air, sometimes one hour or more" (Tr. 2627); on cross-examination by one of plaintiff's counsel, he answered: that the episode of the plaintiff with don Manuel

narrated by the witness, making a conservative calculation, was about two years before he left (before 1943) (Tr. 2628), which would take us to 1941 or less (Tr. 2640).

In these tensions between promise and repudiation we meet the three parties which take part in the correspondence we are analyzing. It is unquestionable that plaintiff's last letter to doña Ana María—Exhibit 56—clearly reflects this game of tensions in which the three parties mentioned play a role. The different salutation, cold and rutinary of this last letter "Mrs. doña Ana María" is a bitter contrast with the salutation of the previous two letters (Exhibits 54 and 55): "My very dear doña Ana" (transcript of documents 465 and 466 et seq.). In this letter doña Ana is informed that "all aid has been denied to me"; that the plaintiff intends to talk to don Genaro Cautiño and ask him for help "but before having this interview with Mr. Cautiño, I am writing to you to ask you to please lend me $250 so that I can get started, because my ideal is to study and work"; that she hopes "that you (doña Ana) are not made out of stone, because a person as religious as you cannot be catalogued in such manner"; that she wants doña Ana to answer her immediately and she writes to her "because it is not logical for a young lady to ask a gentleman for money, but since all aid has been denied to me, I shall have no other alternative, I do not ask you because I have any right, because I am not worthy that you throw your crumbs to a dog because I have always known my place. It would have been better for my mother and my father and myself to have had a stone tied to our necks and thrown into the sea instead of bringing children into the world to work and pains".

Whatever the relation that might have existed between the plaintiff and the spouses González-Hernández, this letter constituted an act of rebellion and contains a silent threat. These are not the words of a humble protegee of a generous

lady, but the clamor of a protest from her status of natural daughter, of a daughter abandoned by her father. At the end of the letter she apologizes to doña Ana "if I have offended you", but she does not apologize to the others who might have refused to help her. Furthermore, she threatens to go for help to a gentleman that does not belong to the family and notwithstanding her scruples on this particular, she has no objection in receiving it from don Manuel. Irrespective of the purpose for which this letter was written, it obtains a highly illuminating result: Juliana is given two hundred dollars for her trip to New York and until the death of don Manuel she is given a pension of fifty dollars monthly. To conclude that all this is nothing more than "an act of charity" of doña Ana María Hernández widow of González is to compel us to imitate the idle gesture practiced by the ostrich from time immemorial in the face of reality.

In his analysis of plaintiff's evidence, the trial judge seems to be peeved because the evidence of the defendant heirs showed that certain statements made by plaintiff and some of her witnesses were false. These "falsehoods" are the following: first, that Juliana testified that soon after her mother Isilé died, she met don Manuel González, and when he asked the girl why she was not in mourning and upon her answering that she had no mourning dresses, don Manuel told Juliana that his wife doña Ana would send her some dresses, something which the trial judge believes is not true because in those days doña Ana María was in Barcelona. The evidence does not establish the date when the mourning dresses were sent to Juliana, either by don Manuel, doña Ana, or any other person (Tr. 459–607). The plaintiff merely testifies that she does not know who sent them, but that after that conversation, "a few days later" they were sent to her. This conversation between don Manuel and Juliana must have taken place during the last days of October or the first days of November 1912,

since Juliana's mother died on October 22, 1912. If the mourning dresses took sometime in reaching her, even a month, there exists the possibility that it was doña Ana María herself who sent them, because, as we have seen, the latter returned from Barcelona in December 1912 or January 1913. This is not a case, therefore, of an absolute "falsehood" but rather of a relative "falsehood" which flows from the lack of precision or accuracy.

The second falsehood consists in that Juliana recognized herself in a picture taken in 1919 in the new school in Sabana Llana, as if she were part of the group, when she actually was not in said school. The picture was taken to court by Eladio Acosta in order to prove that he had studied in said school and the teachers who arrived there in 1919 admit that Eladio Acosta was in the group. Eladio Acosta came to testify in favor of the plaintiff in this case because Serafín Pabón, the witness for the defendant heirs, informed plaintiff's counsel that the person who would know who were the ones who studied in said school in the lower grades was Eladio Acosta. Plaintiff did not remember those first school years. This is shown by the fact that it is her own counsel who must perform the investigation of those years in order to organize their evidence. The manner how plaintiff describes the only teacher which she remembers as "one who spent the whole day speaking through the window with a Spaniard that made love to her" shows that she did not have a clear memory as to the name of this teacher. Eladio Acosta testifies before she does and in her presence that plaintiff studied the second grade—possibly the low second grade, because the room was divided thus, as shown by the evidence—with a teacher named Miss Silva, and then Juliana believes that the teacher who made her waste her time because she spent the whole day talking to a Spaniard through the window is Miss Silva, and that the photograph shown by Eladio Acosta for the first time corresponds to the

year she studied with Miss Silva. Then she says that she studied with Miss Silva and that "the little Chinese-looking kid there" is she.

The defendant heirs bring an impressing number of witnesses to prove that the school where the picture was taken was constructed after the witness had left school, that Miss Silva did not arrive at the school until 1919, and that the girl which Juliana points out is not plaintiff, but another girl. Defendant heirs' own evidence shows that it was during the school year 1915–1916 that the new school was built (Tr. 1267–1268) and that was the last year that plaintiff stayed in the school at Sabana Llana. It is nothing strange, therefore, that the place was at least known to her. Her "falsehood" is limited to mistaking the teacher that spent the whole day at the window talking with a Spaniard for Miss Silva and in finding herself in the picture in the place that correspond to Valentina González Ruiz (Tr. 1273–1274).

It is unquestionable that plaintiff is not in the picture and that her assertion to the contrary is a regrettable exaggeration. But this is not sufficient to discard the rest of her testimony as to her first school years in Sabana Llana, for her testimony is corroborated to a great extent by the witnesses of the defendant heirs, which place her in 1916, not in 1914, as defendant heirs' evidence attempted to do in vain, studying her second grade in the school of Coquí, while she lived in Sabater.

In situations such as these the most reasonable rule seems to be the one we laid down in *Alicea* v. *Antuñano*, 50 P.R.R. 880, 890 (Travieso, 1937): "It frequently happens that witnesses exaggerate, that they embroider facts, that they say more, particularly in cases of this kind, than what really happened, but that does not mean that their testimony is not in substance true."

The third "falsehood" of plaintiff's evidence refers to the fact that plaintiff testified that she was living in the house of don Manuel until October 1919, date on which she went to the private school or asylum in Ponce, and that she was taken to the school by don Manuel and doña Ana María, and the documentary evidence shows that this could not have been true because a newspaper report (Exhibit e) establishes that don Manuel, his wife doña Ana María and their children sailed for New York on August 21, 1919. As may be seen, this is a case, as to that point, of a relative falsehood, one which flows from the inaccuracy or lack of precision and not of an absolute falsehood. The evidence of the defendant heirs shows that when the girl comes running from the beating of Cristina, at sometime between June and August 1919, she takes refuge in the house of don Manuel González, and from there she is sent to the school or asylum in Ponce. Whether this happened the next day or several months afterwards does not change the nature of the inaccuracy or imprecision characteristic of every relative falsehood. Their own evidence shows that don Manuel returned from this trip of August 1919, on the following month, September 1919 (Exhibit I). If plaintiff had testified that only don Manuel went with her to the school, her testimony, as to this point, would have entered the balance between the possibility and probability characteristic of every judicial testimony.

The fourth "falsehood" of plaintiff's evidence refers to the fact that plaintiff and her witness Carmen Faura García testified that while Juliana and her witness Carmen were in the convent in Cuba, between the years 1927 and 1928, don Manuel went to Cuba and while there he visited his daughter in the convent, and on one occasion when don Manuel goes out with the plaintiff through Havana, Juliana shows to him Hotel Nacional. Defendant heirs bring ample documentary and oral evidence to show that don Manuel

was not in Cuba during those two years. According to a certificate from the General Director of Immigration, it is established that from January 1, 1927 to December 31, 1928, the Spanish citizen, resident in Puerto Rico, don Manuel González Martínez, did not enter the territory of the Republic of Cuba. Another certificate establishes that Hotel Nacional of Havana was not finished until December 13, 1930. A number of checks which begin on January 3, 1927 until August 24, 1928, shows that during said period of time don Manuel signed his checks in Puerto Rico with short intervals of time, some of six, five and four days. The evidence of the defendant heirs show that don Manuel, together with his family, sailed for Spain via New York, and that while in New York he received the news of the San Felipe hurricane which blasted the island on September 13, 1928, and don Manuel decided to return to Puerto Rico, arriving here on October 1, 1928, staying in his farm at Salinas for the rest of the year 1928.

The only impeachment against these two testimonies of Juliana and Carmen refer exclusively to the dates on which don Manuel visits Cuba and the finishing of Hotel Nacional in Havana. The evidence shows that plaintiff Juliana Sanabria arrived at Cuba on April 4, 1926 (Tr. 532) and returned to Puerto Rico on February 16, 1938 (Tr. 551) while Carmen Faura García arrived at Cuba in 1921 (Tr. 33) and returned to Puerto Rico in 1940 (Tr. 364). So that the period of knowledge or observation of both witnesses is more ample than the period of time challenged by the evidence of the defendant heirs which would cover the years 1927–1930. This leaves open the possibility that before or after those years don Manuel might have made a visit to the convent and had taken the ride with Juliana and Mr. Menocal to the historical places of Havana. The defendant's own witness, doña Ana María Hernández widow of González, testifies that during the first years of her mar-

riage don Manuel had business in great scale in the island of Cuba (Tr. 3446). This leaves open the opportunity of other trips of don Manuel to Cuba.

It is unquestionable that the fixing of the date of the visit of don Manuel to Cuba, in the testimony of his daughter Juliana Sanabria (Tr. 541), as well as in the testimony of Carmen Faura García (Tr. 347), is inferred from a set of fortuitous circumstances, such as the taking of a novice's vows and the religious habits. There always lurks in the mind of the judge the suspicion whether this would have been always like this if the only detail in controversy—the date of a visit—had not been mistaken. This, apart from the juridical problem raised by the certificates presented by the defendant heirs, which perhaps would not permit us to consider its contents as an undisputed fact. But we need not reach that point, since the case does not rest exclusively on that single fact.

Assuming, without deciding, that these four "falsehoods" had been proved in an absolute manner, does this mean that we are authorized to discard the rest of plaintiff's evidence? Our answer must be categorically in the negative, particularly in a case like this where most of the contradictions and inaccuracies appearing in the evidence of the adverse party and a substantial part of the evidence in favor of the cause of action are corroborated by the adverse party's own evidence.

In the proceeding before us, the respondent heirs continually warn us of our lack of power to set aside the findings of the trial court. This compels us to formulate once more the true scope of Rule 43.1 of the Rules of Civil Procedure for the Courts of Puerto Rico.

The impossibility of reproducing before the appellate or reviewing courts the purely expressive elements of oral testimony, made it the duty of those courts to respect the weigh-

ing by the trial judge of those elements of credibility spontaneously revealed by the witness' demeanor in the course of his testimony before a trier of facts.

This is not the time to make a critical examination of that small specimen of the expressive indicia which presumably are a part of the sagacity of a trier of facts. With the knowledge of applied psychology which we now have, we know it is highly improbable to observe, during such a brief period and under such impracticable circumstances as are met in a trial on the facts, the moral demeanor of a witness. Let us disregard for the time being the ingenuous specimen of the expressive indicia learned by experience by a trier of facts in arriving at the truth through that curious plastic revelation of the credibility which is presumably reflected on the human figure. I confess that my ten years' experience as a trier of facts has created in my mind great doubt on the effectiveness of the method. For a critique on demeanor evidence, see *National Labor Relations Board* v. *Dinion Coil Co.*, 201 F.2d 484, 487–490 (Frank, 1952).

Following the civil jury practice or the practice of equity, it was for a long time a fairly acceptable rule for the appellate and reviewing courts that if there was sufficient evidence in the transcript of the oral testimony as to the trial judge's finding, appellate or reviewing courts would not disturb such finding. We need but ponder awhile to realize the absurdity that might result in judicial practice in superimposing the rudimentary perception of the expressive elements of credibility upon the reasoned concept of the logical elements of credibility.

The inclusion in Rule 52 (a) of the Federal Rules of Civil Procedure of the new provision that findings of fact based on oral testimony would be set aside if clearly erroneous, gave the progressive courts an opportunity to formulate a new rule of judicial practice in the sense that the finding

made by the trial judge shall not prevail, although it was supported by sufficient evidence, if such finding of fact did not represent the more rational, fair, and juridical balance of the entire evidence. As stated in the words of Stanley Reed, learned Justice of the Supreme Court of the United States: "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (*United States* v. *Gypsum Co.*, 333 U.S. 364, 395; 92 L.Ed. 746, 766 (Reed, 1948). Contrary to the supposition that this interpretation by the Supreme Court of the United States was due to unusual circumstances which did not interfere at all with the old practice of conclusiveness, it has become the general rule in all those cases where the trial judge's findings conflict with the more rational, fair, and juridical balance of the entire evidence (the weight of the evidence). *Arnolt Corp.* v. *Stansen Corp.*, 189 F.2d 5, 9 (Finnegan, 1951); *Smith* v. *Manning*, 189 F.2d 345, 349 (Kalodner, 1951); *Gildorff* v. *Prince*, 189 F.2d 897, 898 (Clark, 1951); *Pennsylvania Thresherman & Farmers' Mut. Cas. Ins. Co.* v. *Crapet*, 199 F.2d 850, 853 (Rives, 1952); *Sturm* v. *Washington Nat. Ins. Co.*, 208 F.2d 97, 102 (Gardner, 1953); *Salaky* v. *The Atlas Barge No. 3*, 208 F.2d 174, 175 (Clark, 1953); *Home Indemnity Co. of New York* v. *Standard Acc. Ins. Co.*, 167 F.2d 919, 923 (Garrecht, 1948); *State Farm Mut. Automobile Ins. Co.* v. *Bonacci*, 111 F.2d 412, 415 (Gardner, 1940).

When the evidence consists not only of oral testimony but also of public or private documents, judicial depositions of absent witnesses, written or oral stipulations of admitted facts, or facts uncontroverted by the allegations or the evidence, the rule of conclusiveness applies exclusively to oral testimony given in the presence of the trier of facts, but

not to the balance of the evidence, in the belief that the appellate or reviewing courts are as able as the trial court to evaluate the balance of the evidence. Thus, the rule of conclusiveness was limited exclusively to that portion of the oral testimony which bears out an irreconcilable conflict, although rationally probable, between two contradictory theories on an essential fact which cannot be settled by any other portion of the evidence, or which to be settled requires those elements expressive of the credibility which the observation of the witness in the course of his testimony affords to the conviction of the trier. *Wigginton* v. *Orders of United Commercial Travelers*, 126 F.2d 659, 661 (Minton, 1942), (stipulated facts); *Johnson* v. *Griffiths S. S. Co.*, 150 F.2d 224, 225 (Garrecht, 1945), (depositions); *Kuhn* v. *Princess Lida of Thurn & Taxis*, 119 F.2d 704, 706 (Jones, 1941), (uncontroverted facts); *Carter Oil Co.* v. *McQuigg*, 112 F.2d 275, 279 (Evans, 1940), (documents); *Equitable Life Assur. Soc.* v. *Irelan*, 123 F.2d 462, 464 (Healy, 1941), (depositions); *Fleming* v. *Palmer*, 123 F.2d 749, 751 (Mahoney, 1941), (documents). It is clear that in those cases where the supremacy of the oral evidence is manifest and the conflict between the irreconcilable testimonies has been settled by the judge, accepting the theory of one of the parties, the rule of conclusiveness applies without any reservation, unless it is contrary to the natural order of things, or to the rational order of human intelligence. See, for example, *Gindorff* v. *Prince, supra*, at 898; as to the conjectural scope of the finding, *Hunter* v. *Dowd*, 198 F.2d 13, 17 (Lindley, 1952); as to the appropriate judicial attitude towards improbabilities, *Old Colony Bondholders* v. *New York, N. H. & H. R. Co.*, 161 F.2d 413, 443 (Frank, dissenting, 1947).

The theoretical impossibility of separating completely the questions of fact and of law in those mixed findings of

fact and conclusions of law, has in turn created the need for distinguishing between purely testimonial inferences and secondary or derivative inferences from purely testimonial inferences. If the finding is sufficient to induce to another finding, the appellate or reviewing court must not disturb it. However, if from the finding, or from the finding directly drawn from the fact finding, the trial judge draws other inferences or conclusions having no factual character, properly speaking, but a juridical character, the second inference drawn from the evaluation of the facts is regarded as a conclusion of law, which is always subject to review and reversal by the appellate or reviewing court. *Kuhn* v. *Princess Lida of Thurn & Taxis, supra,* at 705 and 706 (Jones, 1941); *E. F. Drew & Co.* v. *Reinhard,* 170 F.2d 679, 683, 684 (Learned Hand, 1948); *American Tobacco Co.* v. *The Katingo Hadjipatera,* 194 F.2d 449, 451 (Frank, 1951); *Ball* v. *Paramount Pictures,* 169 F.2d 317, 318 (McLaughlin, 1948); *Orvis* v. *Higgins,* 180 F.2d 537, 538, 539, 540 (Frank, 1950).

Summing up, the trial judge's findings will be sustained where, upon examination of the entire evidence, they constitute the more rational, fair, and juridical balance of the evidence and do not contravene the natural order of things nor the rational order of human intelligence. Any deduction or inference from a finding, which does not represent a deduction or inference from such finding, but the application of a legal principle, a logical reasoning, or a juridical opinion to a finding, or to the fact deduced or drawn from the finding, will be regarded as a conclusion of law subject to review and reversal by the appellate or reviewing court. See *Rivera* v. *Crescioni,* 77 P.R.R. 43, 62–65 (1954). This case might serve as an example of how findings of fact, by virtue of the inferences of the trial judge, may become conclusions of law, and as such, are not binding on an appellate or reviewing court.

■ There remains for our consideration whether the present action has prescribed. The evidence has shown that the plaintiff Juliana Sanabria was born on March 8, 1905 and that at the time of plaintiff's conception don Manuel González and Isilé Sanabria could have married, with or without dispensation, because don Manuel married for the first time on September 3, 1904. Therefore, plaintiff Juliana Sanabria has the status of natural daughter and for the purposes of prescription the provision of Act No. 73 of 1911—§ 126 of the Civil Code of Puerto Rico—is applicable insofar as it provides that natural children may institute an action of acknowledgment in the lifetime of their presumptive parents or one year after their death —*Fuentes* v. *District Court*, 73 P.R.R. 893, 905–907 (Ortiz, 1952) ; *Figueroa* v. *Heirs of Carrasquillo*, 74 P.R.R. 1, 5 (Pérez Pimentel, 1952).

The evidence indicates that don Manuel González died on October 16, 1944 and the complaint in this case was filed on May 7, 1945, that is, within the year of the death of the putative natural father. This being so, the action of the plaintiff has not prescribed.

The judgment of the Superior Court of Puerto Rico, San Juan Part, rendered on November 30, 1950, dismissing the complaint shall be reversed and another judgment shall be rendered declaring plaintiff Juliana Sanabria the acknowledged natural daughter of don Manuel González Martínez. The case shall be remanded to the trial court for further proceedings consistent with this opinion.

Mr. Chief Justice Negrón Fernández, Mr. Justice Pérez Pimentel, Mr. Justice Serrano Geyls, and Mr. Justice Blanco Lugo did not participate herein.

Mr. Justice Dávila concurs in the result, but wishes to state that he does not agree with that part of the opinion which discusses the scope of Rule 43.1 of the Rules of Civil Procedure for the Courts of Puerto Rico.